# EX PARTE CROW DOG.

### ORIGINAL.

Argued November 26th, 1883.—Decided December 17th, 1883.

*Crimes—Indians—Indian Country—Repeal—Statutes—Treaties.*

1. The 1st Judicial District Court of Dakota, sitting as a circuit court of the United States, has jurisdiction under the laws of the United States, over offences made punishable by those laws committed within that part of the Sioux reservation which is within the limits of the Territory.
2. In the interpretation of statutes, clauses which have been repealed may still be considered in construing provisions which remain in force.
3. The definition of the term "Indian Country," contained in c. 61, § 1 of the act of 1834, 4 Stat. 729, though not incorporated in the Revised Statutes, and though repealed simultaneously with their enactment, may be referred to in order to determine what is meant by the term when used in statutes ; and it applies to all the country to which the Indian title has not been extinguished within the limits of the United States, whether within a reservation or not, and whether acquired before or since the passage of that act. .
4. The legislation of the United States may be constitutionally extended over Indian country by mere force of a treaty, without legislative provisions.
5. Neither the provisions of article 1 in the treaty of 1868 with the Sioux, that "if bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws," nor any other provision in that act, nor the provision in article 8 of the agreement embodied in the act of February 28th, 1877, c. 72, 19 Stat. 256, that they "shall be subject to the laws of the United States," nor any other provision in that agreement or act, operated to repeal the provision of Rev. Stat. § 2146, which excepts from the general jurisdiction of courts of the United States over offences committed in Indian country, "crimes committed by one Indian against the person or property of another Indian," and offences committed in Indian country by an Indian who has been punished by the local law of the tribe ; and offences where by treaty stipulations the exclusive jurisdiction over the same is or may be secured to the Indian tribes respectively.
6. The objects sought to be accomplished by the treaty of 1868 with the Sioux, and the humane purposes of Congress in the legislation of 1877, examined and shown to be inconsistent with the assumption of such a general jurisdiction by the courts of the United States.

7. The doctrine that courts do not favor repeals of statutes by implication re-asserted and authorities referred to. Especially a court of limited and special jurisdiction should not take jurisdiction over a case involving human life, through an implied repeal of a statute denying it, when the words relied on are general and inconclusive : and the fact that to hold that a statute repeals by implication a previous act would reverse a well settled policy of Congress, justifies the courts in requiring a clear expression of the intention of Congress in the repealing act.

Petition for writs of habeas corpus and certiorari.

*Mr. A. J. Plowman* for petitioner.
*Mr. Solicitor-General* for United States.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The petitioner is in the custody of the marshal of the United States for the Territory of Dakota, imprisoned in the jail of Lawrence County, in the First Judicial District of that Territory, under sentence of death, adjudged against him by the district court for that district, to be carried into execution January 14th, 1884. That judgment was rendered upon a conviction for the murder of an Indian of the Brule Sioux band of the Sioux nation of Indians, by the name of Sin-ta-ge-le-Scka, or in English, Spotted Tail, the prisoner also being an Indian, of the same band and nation, and the homicide having occurred as alleged in the indictment, in the Indian country, within a place and district of country under the exclusive jurisdiction of the United States and within the said judicial district. The judgment was affirmed, on a writ of error, by the Supreme Court of the Territory. It is claimed on behalf of the prisoner that the crime charged against him, and of which he stands convicted, is not an offence under the laws of the United States; that the district court had no jurisdiction to try him, and that its judgment and sentence are void. He therefore prays for a writ of habeas corpus, that he may be delivered from an imprisonment which he asserts to be illegal.

The indictment is framed upon section 5339 of the Revised Statutes. That section is found in title LXX., on the subject of crimes against the United States, and in chapter three, which treats of crimes arising within the maritime and territorial

jurisdiction of the United States. It provides that "every person who commits murder, . . . within any fort, arsenal, dock-yard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States, . . . shall suffer death."

. Title XXVIII. of the Revised Statutes relates to Indians, and the sub-title of chapter four is, Government of Indian Country. It embraces many provisions regulating the subject of intercourse and trade with the Indians in the Indian country, and imposes penalties and punishments for various violations of them. Section 2142 provides for the punishment of assaults with deadly weapons and intent, by Indians upon white persons, and by white persons upon Indians; section 2143, for the case of arson, in like cases; and section 2144 provides that "the general laws of the United States defining and prescribing punishments for forgery and depredations upon the mails shall extend to the Indian country."

The next two sections are as follows:

"SEC. 2145. Except as to crimes, the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

SEC. 2146. The preceding section shall not be construed to extend to [crimes committed by one Indian against the person or property of another Indian, nor to] any Indian committing any offence in the Indian country who has been punished by the local law of the tribe, or to any case where by treaty stipulations the exclusive jurisdiction over such offences is or may be secured to the Indian tribes respectively."

That part of section 2146 placed within brackets was in the act of 27th March, 1854, c. 26, § 3, 10 Stat. 270, was omitted by the revisers in the original revision, and restored by the act of 18th February, 1875, c. 80, 18 Stat. 318, and now appears in the second edition of the Revised Statutes. It is assumed for the purposes of this opinion that the omission in the original

revision was inadvertent, and that the restoration evinces no other intent on the part of Congress than that the provision should be considered as in force, without interruption, and not a new enactment of it for any other purpose than to correct the error of the revision.

The district courts of the Territory of Dakota are invested with the same jurisdiction in all cases arising under the laws of the United States as is vested in the circuit and district courts of the United States. Rev. Stat. §§ 1907–1910. The reservation of the Sioux Indians, lying within the exterior boundaries of the Territory of Dakota, was defined by Art. II. of the treaty concluded April 29th, 1868, 15 Stat. 635, and by § 1839 Rev. Stat. it is excepted out of and constitutes no part of that Territory. The object of this exception is stated to be to exclude the jurisdiction of any State or Territorial government over Indians, within its exterior lines, without their consent, where their rights have been reserved and remain unextinguished by treaty. But the district courts of the Territory having, by law, the jurisdiction of district and circuit courts of the United States, may, in that character, take cognizance of offences against the laws of the United States, although committed within an Indian reservation, when the latter is situate within the space which is constituted by the authority of the Territorial government the judicial district of such court. If the land reserved for the exclusive occupancy of Indians lies outside the exterior boundaries of any organized Territorial government, it would require an act of Congress to attach it to a judicial district; of which there are many instances, the latest being the act of January 6th, 1883, by which a part of the Indian Territory was attached to the District of Kansas and a part to the Northern District of Texas. 22 Stat. 400. In the present case the Sioux reservation is within the geographical limits of the Territory of Dakota, and being excepted out of it only in respect to the Territorial government, the district court of that Territory, within the geographical boundaries of whose district it lies, may exercise jurisdiction under the laws of the United States over offences made punishable by them committed within its limits. *United States* v. *Dawson*, 15 How. 467;

*United States* v. *Jackalow*, 1 Black, 484; *United States* v. *Rogers*, 4 How. 567; *United States* v. *Alberty*, Hempst. 444, opinion by Mr. Justice Daniel; *United States* v. *Starr*, Hempst. 469; *United States* v. *Ta-wan-ga-ca* or *Town Maker, an Osage Indian*, Hempst. 304.

The district court has two distinct jurisdictions. As a Territorial court it administers the local law of the Territorial government; as invested by act of Congress with jurisdiction to administer the laws of the United States, it has all the authority of circuit and district courts; so that, in the former character, it may try a prisoner for murder committed in the Territory proper, under the local law, which requires the jury to determine whether the punishment shall be death or imprisonment for life, Laws of Dakota, 1833, ch. 9; and, in the other character, try another for a murder committed within the Indian reservation, under a law of the United States, which imposes, in case of conviction, the penalty of death.

Sec. 2145 of the Revised Statutes extends the general laws of the United States as to the punishment of crimes committed in any place within their sole and exclusive jurisdiction, except the District of Columbia, to the Indian country, and it becomes necessary, therefore, to inquire whether the locality of the homicide, for which the prisoner was convicted of murder, is within that description.

The first section of the Indian Intercourse Act of June 30th, 1834, 4 Stat. 729, defines the Indian country as follows:

"That all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana, or the Territory of Arkansas, and, also, that part of the United States east of the Mississippi River, and not within any State to which the Indian title has not been extinguished, for the purposes of this act, be taken and be deemed to be the Indian country."

Since the passage of that act great changes have taken place by the acquisition of new territory, by the creation of new States, and by the organization of Territorial governments; and the Revised Statutes, while retaining the substance of many important provisions of the act of 1834, with amendments and

additions since made regulating intercourse with the Indian tribes, have, nevertheless, omitted all definition of what now must be taken to be "the Indian country." Nevertheless, although the section of the act of 1834 containing the definition of that date has been repealed, it is not to be regarded as if it had never been adopted, but may be referred to in connection with the provisions of its original context which remain in force, and may be considered in connection with the changes which have taken place in our situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes. It is an admitted rule in the interpretation of statutes that clauses which have been repealed may still be considered in construing the provisions that remain in force. Bramwell, L. J., in *Attorney-General* v. *Lamplough*, L. R. 3 Ex. D. 223–227; Hardcastle on Statutory Law, 217; *Bank for Savings* v. *Collector*, 3 Wall. 495–513; *Commonwealth* v. *Bailey*, 13 Allen, 541. This rule was applied in reference to the very question now under consideration in *Bates* v. *Clark*, 95 U. S. 204, decided at the October term, 1877. It was said in that case by Mr. Justice Miller, delivering the opinion of the court, that "it follows from this that all the country described by the act of 1834 as Indian country remains Indian country so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress." In our opinion that definition now applies to all the country to which the Indian title has not been extinguished within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of Indians, although much of it has been acquired since the passage of the act of 1834, and notwithstanding the formal definition in that act has been dropped from the statutes, excluding, however, any territory embraced within the exterior geographical limits of a State, not excepted from its jurisdiction by treaty or by statute, at the time of its admission into the Union, but saving, even in respect to territory not thus excepted and actually in the exclusive occupancy of Indians, the authority of Congress over it,

under the constitutional power to regulate commerce with the Indian tribes, and under any treaty made in pursuance of it. *United States* v. *McBratney*, 104 U. S. 621.

This definition, though not now expressed in the Revised Statutes, is implied in all those provisions, most of which were originally connected with it when first enacted, and which still refer to it. It would be otherwise impossible to explain these references, or give effect to many of the most important provisions of existing legislation for the government of Indian country.

It follows that the *locus in quo* of the alleged offence is within Indian country, over which, territorially, the District Court of the First Judicial District of Dakota, sitting with the authority of a Circuit Court of the United States, had jurisdiction.

But if § 2145 Rev. Stat. extends the act of Congress, § 5339, punishing murder, to the locality of the prisoner's offence, § 2146 expressly excepts from its operation "crimes committed by one Indian against the person or property of another Indian;" an exception which includes the case of the prisoner, and which, if it is effective and in force, makes his conviction illegal and void. This brings us at once to the main question of jurisdiction, deemed by Congress to be of such importance to the prisoner and the public, as to justify a special appropriation for the payment of the expenses incurred on his behalf in presenting it for decision in this proceeding to this court. 22 Stat. 624, ch. 143, March 3d, 1883.

The argument in support of the jurisdiction and conviction is, that the exception contained in § 2146 Rev. Stat. is repealed by the operation and legal effect of the treaty with the different tribes of the Sioux Indians of April 29th, 1868, 15 Stat. 635; and an act of Congress, approved February 28th, 1877, to ratify an agreement with certain bands of the Sioux Indians, &c., 19 Stat. 254.

The following provisions of the treaty of 1868 are relied on:

"ARTICLE I. From this day forward all war between the parties to this agreement shall forever cease. The government of the United States desires peace, and its honor is hereby pledged to

keep it. The Indians desire peace, and they now pledge their honor to maintain it.

" If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the commissioner of Indian affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

"If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws ; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this or other treaties made with the United States. And the President, on advising with the commissioner of Indian affairs, shall prescribe such rules and regulations for ascertaining damages under the provisions of this article as in his judgment may be proper. But no one sustaining loss while violating the provisions of this treaty or the laws of the United States shall be reimbursed therefor."

The second article defines the reservation which, it is stipulated, is

" set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them ; and the United States now solemnly agrees that no persons except those herein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over,

settle upon, or reside in the territory described in this article." . . .

"ARTICLE V. The United States agrees that the agent for said Indians shall in future make his home at the agency building; that he shall reside among them and keep an office open at all times for the purpose of prompt and diligent inquiry into such matters of complaint by and against the Indians as may be presented for investigation under their treaty stipulations, as also for the faithful discharge of other duties enjoined upon him by law. In all cases of depredation on person or property he shall cause evidence to be taken in writing and forwarded, together with his findings, to the commissioner of Indian affairs, whose decision, subject to the revision of the secretary of the interior, shall be binding on the parties to this treaty."

Other provisions of this treaty are intended to encourage the settlement of individuals and families upon separate agricultural reservations, and the education of children in schools to be established. The condition of the tribe in point of civilization is illustrated by stipulations on the part of the Indians, that they will not interfere with the construction of railroads on the plains or over their reservation, nor attack persons at home or travelling, nor disturb wagon trains, mules, or cattle belonging to the people of the United States, nor capture nor carry off white women or children from the settlements, nor kill nor scalp white men, nor attempt to do them harm.

By the Indian Appropriation Act of August 15th, 1876, Congress appropriated one million dollars for the subsistence of the Sioux Indians, in accordance with the treaty of 1868, and "for purposes of their civilization," 19 Stat. 192; but coupled it with certain conditions relative to a cession of a portion of the reservation, and with the proviso, "that no further appropriation for said Sioux Indians for subsistence shall hereafter be made until some stipulation, agreement or arrangement shall have been entered into by said Indians with the President of the United States, which is calculated and designed to enable said Indians to become self-supporting."

In pursuance of that provision the agreement was made, which was ratified in part by the act of Congress of February

28th, 1877. The enactment of this agreement by statute, instead of its ratification as a treaty, was in pursuance of the policy which had been declared for the first time in a proviso to the Indian Appropriation Act of March 3d, 1871, 16 Stat. 566, ch. 120, and permanently adopted in section 2079 of the Revised Statutes, that thereafter " no Indian nation or tribe within the territory of the United States, shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty," but without invalidating or impairing the obligation of subsisting treaties.

The instrument in which the agreement was embodied was signed by the commissioners, on the part of the United States, and by the representative chiefs and head men of the various Sioux tribes, but with certain exceptions on the part of some of the latter, and consisted of eleven articles.

The first defines the boundaries of the reservation; the second provides for wagon roads through it to the country lying west of it, and for the free navigation of the Mississippi River; the third for the places where annuities shall be received.

ARTICLE 4 was as follows:

" The government of the United States and the said Indians being mutually desirous that the latter should be located in a country where they may eventually become self-supporting and acquire the arts of civilized life, it is therefore agreed that the said Indians shall select a delegation of five or more chiefs and principal men from each band, who shall, without delay, visit the Indian Territory, under the guidance and protection of suitable persons, to be appointed for that purpose by the department of the interior, with a view to selecting therein a permanent home for the said Indians. If such delegation shall make a selection which shall be satisfactory to themselves, the people whom they represent, and to the United States, then the said Indians agree that they will remove to the country so selected within one year from this date. And the said Indians do further agree in all things to submit themselves to such beneficent plans as the government may provide for them in the selection of a country suitable

for a permanent home where they may live like white men." 19 Stat. 255.

The fifth article recites that, in consideration of the foregoing cession of territory and rights, the United States agrees " to provide all necessary aid to assist the said Indians in the work of civilization ; to furnish to them schools, and instruction in mechanical and agricultural arts, as provided for by the treaty of 1868 ; " to provide subsistence, &c.

ARTICLE 8 is as follows :

" The provisions of the said treaty of 1868, except as herein modified, shall continue in full force, and, with the provisions of this agreement, shall apply to any country which may hereafter be occupied by the said Indians as a home ; and Congress shall, by appropriate legislation, secure to them an orderly government; they shall be subject to the laws of the United States, and each individual shall be protected in his rights of property, person, and life.

" ARTICLE 9. The Indians, parties to this agreement, do hereby solemnly pledge themselves, individually and collectively, to observe each and all of the stipulations herein contained ; to select allotments of land as soon as possible after their removal to their permanent home, and to use their best efforts to learn to cultivate the same. And they do solemnly pledge themselves that they will, at all times, maintain peace with the citizens and government of the United States ; that they will observe the laws thereof, and loyally endeavor to fulfil all the obligations assumed by them under the treaty of 1868 and the present agreement, and to this end will, whenever requested by the President of the United States, select so many suitable men from each band to co-operate with him in maintaining order and peace on the reservation as the President may deem necessary, who shall receive such compensation for their services as Congress may provide."

By the 11th and last article it was provided that the term reservation, as therein used, should be held to apply to any country which should be selected under the authority of the United States as their future home.

The 4th article and part of the 6th article of the agreement,

which referred to the removal of the Indians to the Indian Territory, were omitted from its ratification, not having been agreed to by the Indians.

If this legislation has the effect contended for, to support the conviction in the present case, it also makes punishable, when committed within the Indian country by one Indian against the person or property or another Indian, the following offences, defined by the general laws of the United States as to crimes committed in places within their exclusive jurisdiction, viz.: manslaughter, § 5341; attempt to commit murder or manslaughter, § 5342; rape, § 5345; mayhem, § 5348; bigamy, § 5352; larceny, § 5356; and receiving stolen goods, § 5357.

That this legislation could constitutionally be extended to embrace Indians in the Indian country, by the mere force of a treaty, whenever it operates of itself, without the aid of any legislative provision, was decided by this court in the case of *The United States* v. *43 Gallons of Whiskey*, 93 U. S. 188. See *Holden* v. *Joy*, 17 Wall. 211; *The Cherokee Tobacco*, 11 Wall. 616. It becomes necessary, therefore, to examine the particular provisions that are supposed to work this result.

The first of these is contained in the first article of the treaty of 1868, that " if bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Indians herein named solemnly agree that they will, upon proof made to their agent and notice by him, deliver up the wrong-doer to the United States, to be tried and punished according to its laws."

But it is quite clear from the context that this does not cover the present case of an alleged wrong committed by one Indian upon the person of another of the same tribe. The provision must be construed with its counterpart, just preceding it, which provides for the punishment by the United States of any bad men among the whites, or among other people subject to their authority, who shall commit any wrong upon the person or property of the Indians. Here are two parties,

among whom, respectively, there may be individuals guilty of a wrong against one of the other—one is the party of whites and their allies, the other is the tribe of Indians with whom the treaty is made. In each case the guilty party is to be tried and punished by the United States, and in case the offender is one of the Indians who are parties to the treaty, the agreement is that he shall be delivered up. In case of refusal, deduction is to be made from the annuities payable to the tribe, for compensation to the injured person, a provision which points quite distinctly to the conclusion that the injured person cannot himself be one of the same tribe. Similar provisions for the extradition of criminals are to be found in most of the treaties with the Indian tribes, as far back, at least, as that concluded at Hopewell with the Cherokees, November 28th, 1785, 7 Stat. 18.

The second of these provisions, that are supposed to justify the jurisdiction asserted in the present case, is the eighth article of the agreement, embodied in the act of 1877, in which it is declared:

"And Congress shall, by appropriate legislation, secure to them an orderly government; they shall be subject to the laws of the United States, and each individual shall be protected in his rights of property, person, and life."

It is equally clear, in our opinion, that the words can have no such effect as that claimed for them. The pledge to secure to these people, with whom the United States was contracting as a distinct political body, an orderly government, by appropriate legislation thereafter to be framed and enacted, necessarily implies, having regard to all the circumstances attending the transaction, that among the arts of civilized life, which it was the very purpose of all these arrangements to introduce and naturalize among them, was the highest and best of all, that of self-government, the regulation by themselves of their own domestic affairs, the maintenance of order and peace among their own members by the administration of their own laws and customs. They were nevertheless to be subject to

the laws of the United States, not in the sense of citizens, but, as they had always been, as wards subject to a guardian; not as individuals, constituted members of the political community of the United States, with a voice in the selection of representatives and the framing of the laws, but as a dependent community who were in a state of pupilage, advancing from the condition of a savage tribe to that of a people who, through the discipline of labor and by education, it was hoped might become a self-supporting and self-governed society. The laws to which they were declared to be subject were the laws then existing, and which applied to them as Indians, and, of course, included the very statute under consideration, which excepted from the operation of the general laws of the United States, otherwise applicable, the very case of the prisoner. Declaring them subject to the laws made them so, if it effected any change in their situation, only in respect to laws in force and existing, and did not effect any change in the laws themselves. The phrase cannot, we think, have any more extensive meaning than an acknowledgment of their allegiance as Indians to the laws of the United States, made or to be made in the exercise of legislative authority over them as such. The corresponding obligation of protection on the part of the government is immediately connected with it, in the declaration that each individual shall be protected in his rights of property, person, and life; and that obligation was to be fulfilled by the enforcement of the laws then existing appropriate to these objects, and by that future appropriate legislation which was promised to secure to them an orderly government. The expressions contained in these clauses must be taken in connection with the entire scheme of the agreement as framed, including those parts not finally adopted, as throwing light on the meaning of the remainder; and looking at the purpose so clearly disclosed in that, of the removal of the whole body of the Sioux nation to the Indian Territory proper, which was not consented to, it is manifest that the provisions had reference to their establishment as a people upon a defined reservation as a permanent home, who were to be urged, as far as it could successfully be done, into the

practice of agriculture, and whose children were to be taught
the arts and industry of civilized life, and that it was no part
of the design to treat the individuals as separately responsible
and amenable, in all their personal and domestic relations
with each other, to the general laws of the United States, out-
side of those which were enacted expressly with reference to
them as members of an Indian tribe.

It must be remembered that the question before us is whether
the express letter of § 2146 of the Revised Statutes, which
excludes from the jurisdiction of the United States the case of
a crime committed in the Indian country by one Indian against
the person or property of another Indian, has been repealed.
If not, it is in force and applies to the present case. The treaty
of 1868 and the agreement and act of Congress of 1877, it is
admitted, do not repeal it by any express words. What we
have said is sufficient at least to show that they do not work a
repeal by necessary implication. A meaning can be given to
the legislation in question, which the words will bear, which is
not unreasonable, which is not inconsistent with its scope and
apparent purposes, whereby the whole may be made to stand.
Implied repeals are not favored. The implication must be
necessary. There must be a positive repugnancy between the
provisions of the new laws and those of the old. *Wood* v. *The
United States*, 16 Pet. 342; *Davies* v. *Fairbairn*, 3 How.
636; *United States* v. *Tynen*, 11 Wall. 88; *State* v. *Stoll*, 17
Wall. 425.

The language of the exception is special and express; the
words relied on as a repeal are general and inconclusive. The
rule is, *generalia specialibus non derogant.* "The general prin-
ciple to be applied," said Bovill, C. J., in *Thorpe* v. *Adams*, L.
R. 6 C. P. 135, "to the construction of acts of Parliament is
that a general act is not to be construed to repeal a previous
particular act, unless there is some express reference to the pre-
vious legislation on the subject, or unless there is a necessary
inconsistency in the two acts standing together." "And the
reason is," said Wood, V. C., in *Fitzgerald* v. *Champenys*, 30
L. J. N. S. Eq. 782; 2 Johns. and Hem. 31–54, "that the
legislature having had its attention directed to a special sub-

ject, and having observed all the circumstances of the case and provided for them, does not intend by a general enactment afterwards to derogate from its own act when it makes no special mention of its intention so to do."

The nature and circumstances of this case strongly reinforce this rule of interpretation in its present application. It is a case involving the judgment of a court of special and limited jurisdiction, not to be assumed without clear warrant of law. It is a case of life and death. It is a case where, against an express exception in the law itself, that law, by argument and inference only, is sought to be extended over aliens and strangers; over the members of a community separated by race, by tradition, by the instincts of a free though savage life, from the authority and power which seeks to impose upon them the restraints of an external and unknown code, and to subject them to the responsibilities of civil conduct, according to rules and penalties of which they could have no previous warning; which judges them by a standard made by others and not for them, which takes no account of the conditions which should except them from its exactions, and makes no allowance for their inability to understand it. It tries them, not by their peers, nor by the customs of their people, nor the law of their land, but by superiors of a different race, according t the law of a social state of which they have an imperfect conception, and which is opposed to the traditions of their history, to the habits of their lives, to the strongest prejudices of their savage nature; one which measures the red man's revenge by the maxims of the white man's morality. It is a case, too, of first impression, so far as we are advised, for, if the question has been mooted heretofore in any courts of the United States, the jurisdiction has never before been practically asserted as in the present instance. The provisions now contained in §§ 2145 and 2146 of the Revised Statutes were first enacted in § 25 of the Indian Intercourse Act of 1834, 4 Stat. 733. Prior to that, by the act of 1796, 1 Stat. 479, and the act of 1802, 2 Stat. 139, offences committed by Indians against white persons and by white persons against Indians were specifically enumerated and defined, and those by Indians against each other were left

to be dealt with by each tribe for itself, according to its local customs. The policy of the government in that respect has been uniform. As was said by Mr. Justice Miller, delivering the opinion of the court in *United States* v. *Joseph*, 94 U. S. 614, 617 :

"The tribes for whom the act of 1834 was made were those semi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the limits of an organized State or Territory, and, in regard to their domestic government, left to their own rules and traditions, in whom we have recognized the capacity to make treaties, and with whom the governments, State and national, deal, with a few exceptions only, in their national or tribal character, and not as individuals."

To give to the clauses in the treaty of 1868 and the agreement of 1877 effect, so as to uphold the jurisdiction exercised in this case, would be to reverse in this instance the general policy of the government towards the Indians, as declared in many statutes and treaties, and recognized in many decisions of this court, from the beginning to the present time. To justify such a departure, in such a case, requires a clear expression of the intention of Congress, and that we have not been able to find.

It results that the First District Court of Dakota was without jurisdiction to find or try the indictment against the prisoner, that the conviction and sentence are void, and that his imprisonment is illegal.

*The writs of habeas corpus and certiorari prayed for will accordingly be issued.*