UNITED STATES *v.* CLAPOX *et al.*

*(District Court, D. Oregon.* July 18, 1888.)

1. INDIANS—UMATILLA INDIANS—GOVERNMENT—POWER OF PRESIDENT.
   The president is authorized by the treaty of June 9, 1855, (12 St. 948,) and the Revised Statutes, (sections 441, 463, 465,) to make rules for the government of the Indians on the Umatilla reservation, including the establishment of an Indian court and police, and the definition of "Indian offenses" and the measure of punishment therefor.

2. SAME—MISDEMEANORS—ADULTERY.
   The term "misdemeanor," as used in No. 9 of the rules promulged by the secretary of the interior on December 2, 1882, for the government of the Indians on the Umatilla and other reservations, includes "adultery."

3. RESCUE—REV. ST. U. S. § 5401.
   An Indian woman, arrested by the Indian police on the Umatilla reservation, on a charge of adultery committed thereon, was committed to the Indian jail for trial before the "court of Indian offenses," and, while so committed, was rescued and set at liberty by the defendants. *Held,* that they thereby committed the crime of rescue, as defined by section 5401 of the Revised Statutes, by forcibly setting a person at liberty who was committed for "a crime against the United States "

*(Syllabus by the Court.)*

Information for a Rescue.

*Lewis L. McArthur,* for plaintiff.

*John J. Balleray,* for defendants.

DEADY, J. The defendants are accused by this information of a violation of section 5401 of the Revised Statutes, which provides:

"Every person who by force sets at liberty or rescues any person who, before conviction, stands committed for any capital crime against the United States, or who by force sets at liberty or rescues any person committed for or convicted of any offense other than capital, shall be fined not more than $500, and imprisoned not more than one year."

It is alleged in the information that on March 27, 1888, the defendants were Indians residing on the Umatilla Indian reservation, and under the charge of a United States Indian agent; that one Minnie was then an Indian woman, married to an Indian, both of whom then resided on said reservation, and were under the charge of said agent; that prior to

said date the secretary of the interior, under the authority and by the direction of the president, promulged certain rules providing for a "court of Indian offenses" and an Indian police force on said reservation, and caused to be erected thereon a jail for the safe-keeping of such persons as might be committed thereto by said court, either for examination or punishment; that no written warrants are issued by said court, and no written record is kept of its findings or judgments; that under the rules establishing said court and police, and the direction of said agent, the officers of said police force had then and there the authority to arrest any Indian whom they might have cause to believe had "committed a crime or an Indian offense" on said reservation, and commit him to jail for examination or trial before said court. On March 27, 1888, said Minnie was arrested on said reservation by said police force for the "offense of living and cohabiting" thereon with an Indian other than her husband, and placed in said jail, to await her trial for said offense before said court; and that said defendants did then and there "unlawfully and with force and arms break open the said jail, enter the same, rescue and set at liberty" said Minnie, contrary to the statute, etc.

The defendants demur to the information, for that it does not state facts sufficient to constitute a crime.

Nos. 4, 5, 6, 7, and 8 of said rules prescribe the punishment for certain acts called therein "Indian offenses," such as the "sun," the "scalp," and the "war dance," polygamy, "the usual practices of so-called 'medicine men,'" the destruction or theft of Indian property, and buying or selling Indian women for the purpose of cohabitation. In addition to these, rule 9 provides that said court shall have "jurisdiction of misdemeanors committed by Indians belonging to the reservation."

On the argument of the demurrer, counsel for the defendants contended that the alleged rescue is not within the purview of the statute, because (1) the act for which Minnie was committed is not a crime "against the United States," but only a violation of an Indian police regulation; and (2) adultery is not a "misdemeanor" at common law, and therefore the court of Indian offenses has no jurisdiction in the premises, and the arrest of Minnie was illegal and void.

It is also doubted whether the interior department has authority to define "Indian offenses," or establish courts for the punishment of Indian offenders, as set forth in said rules.

And first, as to the authority of the department in the premises.

By article 8 of the treaty of June 9, 1855, (12 St. 948,) between the United States and certain tribes and bands of Indians of eastern Oregon and Washington, of which the Umatilla Indians are one, it is provided:

"The confederate bands acknowledge their dependence on the government of the United States, * * * and engage to submit to and observe all laws, rules, and regulations which may be prescribed by the United States for the government of said Indians."

The Revised Statutes provide:

Sec. 441. "The secretary of the interior is charged with the supervision of the public business relating to the * * * Indians."

Sec. 463. "The commissioner of Indian affairs shall, under the direction of the secretary of the interior, and agreeably to such regulations as the president may prescribe, have the management of all Indian affairs, and of all matters arising out of the Indian relations."

Sec. 465. "The president may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs."

By this treaty the Umatilla Indians engaged to submit to any rule that might be prescribed by the United States for their government. This obviously includes the power to organize and maintain this Indian court and police, and to specify the acts or conduct concerning which it shall have jurisdiction. This treaty is an "act" or law "relating to Indian affairs,"—the affairs of these Indians; and by said section 465 the power to prescribe a rule for carrying the same into effect is given to the president, who has exercised the same in this case through the proper instrumentality,—the secretary of the interior.

Then there is the general power given by said sections 441 and 463 to the president, acting through the secretary of the interior and the commissioner of Indian affairs, to make regulations for the "management of all Indian affairs, and of all matters arising out of the Indian relations."

These "courts of Indian offenses" are not the constitutional courts provided for in section 1, art. 3, Const., which congress only has the power to "ordain and establish," but mere educational and disciplinary instrumentalities, by which the government of the United States is endeavoring to improve and elevate the condition of these dependent tribes to whom it sustains the relation of guardian. In fact, the reservation itself is in the nature of a school, and the Indians are gathered there, under the charge of an agent, for the purpose of acquiring the habits, ideas, and aspirations which distinguish the civilized from the uncivilized man.

As was said by the supreme court in *U. S.* v. *Kagama*, 118 U. S. 383, 6 Sup. Ct. Rep. 1109:

"These Indian tribes are the wards of the nation; they are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection."

There is no doubt of the power of the United States to make these rules, nor that the president is authorized by congress to exercise the same. It is admitted that adultery was not a crime at common law, except in the time of the commonwealth, when it was punished with death. 4 Bl. Comm. 64; 1 Bish. Crim. Law, § 39. Blackstone says: "At the Restoration, when men, from an abhorrence of the hypocrisy of the late times, fell into a contrary extreme of licentiousness, it was not thought proper to renew a law of such unfashionable rigor." And this offense "has ever since been left to the feeble coercion of the spiritual court, according to the rules of the canon law; a law which has treated the offense of incontinence, nay, even adultery itself, with a great degree of tenderness and lenity, owing, perhaps, to the constrained celibacy of its first compilers."

v.35F.no.8—37

In this country, where there is neither an established religion nor ecclesiastical courts, the offense is only punishable in the common-law courts when so provided by statute.

A misdemeanor is defined to be "any crime or indictable offense not amounting to felony." Rap. & L. Law Dict. "Misdemeanor." Blackstone says, (4th book, 5:)

"A crime or misdemeanor is an act committed or omitted in violation of public law either forbidding or commanding it. This general definition comprehends both crimes and misdemeanors, which, properly speaking, are synonymous terms, though in common usage. The word 'crimes' is made to denote such offenses as are of a deeper and more atrocious dye, while smaller faults and omissions of less consequence are comprised under the gentler name of 'misdemeanors' only."

But the term is sometimes, and not seldom, used in and out of statutes to denote a mere wrong not punishable as a crime. In *Rex* v. *Wilkes*, 4 Burrows, 2540, the term as used in 4 & 5 Wm. & Mary, c. 18, in relation to outlawries, was held not to include the case of a conviction for a libel, but was confined to trespass and other civil cases. The definition given in Worcester is: "An offense; ill behavior; evil conduct; misconduct; fault."

Adultery, though not punishable by the English common law, was defined and punishable by the English ecclesiastical or canon law. And this latter was in a sense a part of the common law of England,—the law of the land. The common law brought to this country by the American colonists included this crime of adultery as defined by the canon law; but, there being no ecclesiastical courts in this country, some of the colonies held that the offense was cognizable in the common-law courts, and others made it so by legislation. 2 Whart. Crim. Law, §§ 1717–1720.

Adultery is a crime by the statute of this state, though a prosecution therefor can only be commenced on the complaint of the injured party. In legal parlance, the act for which Minnie was committed is, in this state and the United States generally, a crime or misdemeanor. In this case the term "misdemeanor" is used in a series of rules promulged by the department of the interior for the improvement of the morals of the Indians on this reservation. In them, after enumerating certain acts and conduct peculiar to the Indian in his savage state, including "plural marriages;" it is provided that the court of Indian offenses "shall also have jurisdiction of misdemeanors committed by the Indians belonging to the reservation." It is altogether in keeping with the general purpose and spirit of these rules that adultery should be prohibited and punished by them, as well as the acts and conduct specifically mentioned therein. In my judgment the term "misdemeanor," as used in the ninth rule, includes and was intended to include the act of adultery.

And lastly, was Minnie committed for a crime against the United States? The answer to this question is not far to seek. A crime is said to be committed against a state or sovereign when the act which constitutes it is a violation of a penal law of such state or sovereign. In this case the United States, by virtue of its power and authority in the premises,

has established a rule, which is, in effect, a law prohibiting the commission of adultery by an Indian on the Umatilla reservation, and providing for the arrest, trial, and punishment of any Indian guilty of a violation of the same. Minnie was committed for a violation of this law, and was therefore commited for a crime against the law-maker,—the United States.

The place or manner of her commitment is immaterial. She might have been committed to the custody of the police officer, if thought necessary or convenient, or any house or inclosure provided for the purpose. Nor need the process have been in writing. From this Indian court and police, in this, their first effort in the administration of justice, written process and proceedings could not have been expected.

The old Knickerbocker, Wouter van Twiller, when exercising the office of magistrate, paid no heed to parchment, but delivered to the constable, as the symbol of his authority, his well-known jack-knife and tobacco box, armed with which the Dogberry of New Amsterdam might safely "comprehend all vagrom men."

But, pleasantry aside, and in conclusion, the act with which these defendants are charged is in flagrant opposition to the authority of the United States on this reservation, and directly subversive of this laudable effort to accustom and educate these Indians in the habit and knowledge of self-government. It is therefore appropriate and needful that the power and name of the government of the United States should be invoked to restrain and punish them. The case falls within the letter of the statute (section 5401, Rev. St.) providing for the punishment of persons who are guilty of rescuing any one committed for an offense against the United States, and I see no reason why it should be construed out of it, or the statute held inapplicable to it.

The demurrer is overruled.