Thomas IRON CROW, Marie Little
Finger and David Black Cat,
Appellants,

v.

The OGLALA[1] SIOUX TRIBE OF the
PINE RIDGE RESERVATION, SOUTH
DAKOTA; Moses Two Bulls, President,
and Charles Little Hawk, Secretary, of
the Oglala Sioux Tribal Council of the
Pine Ridge Indian Reservation, South
Dakota, East Section; Peter Mesteth as
Judge of the Oglala Sioux Tribal Court,
Appellees.

No. 15387.

United States Court of Appeals
Eighth Circuit.
March 6, 1956.

1. Also spelled "Ogallala" as in 129 F. Supp. 15.

John C. Farrar, Rapid City, S. D., for appellants.

Richard Schifter (Arthur Lazarus, Jr., Washington, D. C., H. R. Hanley, Rapid City, S. D., Strasser, Spiegelberg, Fried & Frank, Washington, D. C., and Hanley & Costello, Rapid City, S. D., were with him on the brief), for appellees.

Fred W. Smith, Atty., Dept. of Justice, Washington, D. C., appeared for United States.

Rufus G. Poole, Washington, D. C., and Charles L. Black, Jr., New York City, Association on American Indian Affairs, Inc., filed brief amicus curiae.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

VOGEL, Circuit Judge.

Inasmuch as the appellants' "statement of the case" is completely concurred in by the appellees, this court will adopt it as follows:

Marie Little Finger and David Black Cat, two of the plaintiffs herein, were tried and convicted in the Oglala Sioux Tribal Court of the crime of adultery under the provisions of § 61 of the Revised Code of the Oglala Sioux Tribe. Jurisdiction was exercised under §§ 1 and 1.2 of said Code, they both being enrolled members of the Oglala Sioux Tribe and the crime having been committed on the Pine Ridge Reservation. The Tribal Court, after reaching a verdict of guilty, imposed fines on both the plaintiffs and sentenced David Black Cat to 30 days in jail, said jail sentence being suspended on condition of the payment of the fine and good behavior for one year. The fines have not been paid and the tribal authorities intend to proceed with the enforcement of the sentences.

These plaintiffs have brought this suit to enjoin the tribe and its officers from proceeding as intended, alleging that the Tribal Court did not have jurisdiction to try and convict them of the crime of adultery, and that enforcement of the sentences of the Tribal Court would deprive said plaintiffs of liberty and property without due process of law in violation of the Fifth Amendment to the Constitution of the United States.

The facts which were the basis for the verdict of guilty in the proceedings before the Tribal Court and the fairness of the procedures of the Tribal Court are not disputed or involved in this case.

The third plaintiff in this case, Thomas Iron Crow, is an enrolled member of the Oglala Sioux Tribe who possessed allotted land on the Pine Ridge Reservation, the title to which is held by the United States in trust for him. Originally all reservation lands were owned by the Oglala Sioux Tribe as a unit, but subsequently parcels of land, including that used by Thomas Iron Crow, were allotted to individual members of the tribe under applicable federal law. These separate tracts remained in trust status and still are classified as Indian country.

In past years, plaintiff has leased some of his land within the Pine Ridge Reservation for grazing purposes to *nonmembers* of the Oglala Sioux Tribe and he plans to continue this practice in the future. The Oglala Sioux Tribe has, under the provisions of Tribal Council Resolution 147–50, assessed a tax against plaintiff's lessee for the privilege of grazing stock on land within the reservation, and it in turn plans to continue to assess the tax in the future. Plaintiff now brings this action to enjoin the tribe from proceeding with that tax assessment.

Plaintiffs make two demands: (1) For an injunction prohibiting the Oglala Sioux Tribal Court from proceeding

with the enforcement of the sentences against David Black Cat and Marie Little Finger; and (2) for an injunction to enjoin the tribe from proceeding with assessment and collection of the tax.

The court entered its findings of fact, conclusions of law, and judgment for the defendants and dismissed the action upon its merits.

This is an appeal from these findings of fact, conclusions of law and the judgment.

For purposes of convenience, the parties will be designated as they were referred to in the court below.

In dismissing this action, the trial court prepared an excellent and comprehensive memorandum which will be found in Thomas Iron Crow v. Ogallala Sioux Tribe, D.C., 129 F.Supp. 15. In the appeal to this court, the plaintiffs set forth six separate points which will be individually discussed. Plaintiffs claim:

*1. The court erred in refusing to grant plaintiffs' request for injunction.*

This point is so inextricably tied in with the ultimate conclusion of the case that it does not require separate discussion.

*2. The court erred in its finding that defendant is a sovereign, dependent nation.*

The status of Indian tribes or nations first received important consideration in the case of Cherokee Nation v. State of Georgia, 1831, 5 Pet. 1, 30 U.S. 1, 8 L.Ed. 25. The opinion, by Chief Justice Marshall, held that, page 15 of 5 Pet., "the acts of our government plainly recognize the Cherokee nation as a state, and the courts are bound by those acts", and that, page 18 of 5 Pet., " * * * an Indian tribe or nation within the United States is not a *foreign* state, in the sense of the constitution, and cannot maintain an action in the courts of the United States". (Emphasis supplied.) The court stated, however, at page 17 of 5 Pet., "they may more correctly perhaps be denominated domestic dependent nations".

The proposition that the Constitution of the United States recognized the sovereignty of Indian tribes obtained greater acknowledgment in the case of Worcester v. State of Georgia, 1833, 6 Pet. 515, at page 535, 31 U.S. 515, at page 535, 8 L.Ed. 483, with Chief Justice Marshall again delivering the opinion of the court, wherein he stated:

"The legislative power of a state, the controlling power of the constitution and laws of the United States, the rights, if they have any, *the political existence of a once numerous and powerful people,* the personal liberty of a citizen, are all involved in the subject now to be considered." (Emphasis supplied.)

Page 559 of 6 Pet.:

"The correct exposition of this article is rendered unnecessary by the adoption of our existing constitution. That instrument confers on congress the powers of war and peace; *of making treaties,* and *of regulating commerce with* foreign nations, and among the several states, and with *the Indian tribes.* These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions; the shackles imposed on this power, in the confederation, are discarded. [Emphasis supplied.]

"The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, * * *."

■ With reference to the constitutionally granted power of making treaties with the Indian tribes, the Supreme Court said, 6 Pet. at page 559:

"The constitution, by declaring treaties already made, *as well as those to be made,* to be the supreme

law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties." (Emphasis supplied.)

It would seem clear that the Constitution, as construed by the Supreme Court, acknowledges the paramount authority of the United States with regard to Indian tribes but recognizes the existence of Indian tribes as *quasi* sovereign entities possessing all the inherent rights of sovereignty excepting where restrictions have been placed thereon by the United States itself.

The Supreme Court, in the case of United States v. Kagama, 1886, 118 U.S. 375, 381, 6 S.Ct. 1109, 1112, 30 L.Ed. 228, stated:

"Following the policy of the European governments in the discovery of America, towards the Indians who were found here, the colonies before the Revolution, and the states and the United States since, have recognized in the Indians a possessory right to the soil over which they roamed and hunted and established occasional villages. But they asserted an ultimate title in the land itself, by which the Indian tribes were forbidden to sell or transfer it to other nations or peoples without the consent of this paramount authority. When a tribe wished to dispose of its land, or any part of it, or the state or the United States wished to purchase it, a treaty with the tribe was the only mode in which this could be done. The United States recognized no right in private persons, or in other nations, to make such a purchase by treaty or otherwise. With the Indians themselves these relations are equally difficult to define. *They were, and always have been, regarded as having a semi-independent position* when they preserved their tribal relations; not as states, not

as nations, not as possessed of the full attributes of sovereignty, but as *a separate people, with the power of regulating their internal and social relations,* and thus far not brought under the laws of the Union or of the state within whose limits they resided." (Emphasis supplied.)

Felix S. Cohen's "Handbook of Federal Indian Law" states, at page 122:

"*Section 2. The Derivation Of Tribal Powers.*

"From the earliest years of the Republic the *Indian tribes have been recognized as 'distinct, independent, political communities',* (citing Worcester v. [State of] Georgia [1832], 6 Pet. 515, 559 [31 U.S. 515, 559, 8 L.Ed. 483], and, *as such, qualified to exercise powers of self-government,* not by virtue of any delegation of powers from the Federal Government, but rather *by reason of their original tribal sovereignty.* Thus treaties and statutes of Congress have been looked to by the courts as limitations upon original tribal powers, or, at most, evidences of recognition of such powers, rather than as the direct source of tribal powers. This is but an application of the general principle that 'It is only by positive enactments, even in the case of conquered and subdued nations, that their laws are changed by the conqueror'.

In point of form, it is immaterial whether the powers of an Indian tribe are expressed and exercised through customs handed down by word of mouth or through written constitutions and statutes. In either case the laws of the Indian tribe owe their force to the will of the members of the tribe." (Emphasis supplied.)

\*      \*      \*      \*      \*

"The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles: (1)

An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative power of the United States and, in substance, terminates the external powers of sovereignty of the tribe, e. g., its power to enter into treaties with foreign nations, but does not by itself affect the internal sovereignty of the tribe, i. e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government."

The opinion of Mr. Justice Matthews, speaking for the Supreme Court in Ex parte Crow Dog, 1883, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030, is of peculiar interest in this case because of tribal and territorial identity, in that it also involved a Sioux Indian in what was then the Territory of Dakota and also because it is a legal landmark in resolving the question of Indian tribal jurisdiction as opposed to federal authority. Crow Dog, the petitioner, a Sioux Indian, was tried for murder in the District Court of the First Judicial District of the Territory of Dakota and was under sentence of death adjudged against him by that court. The judgment was rendered on a conviction for the murder of an Indian of the same band and nation, the murder having been committed in Indian country. The judgment was affirmed by the Supreme Court of the territory. Crow Dog claimed that the crime charged against him and of which he was convicted was not an offense under the laws of the United States, that the District Court had no jurisdiction to try him, and that its judgment and sentence were void. He prayed for a writ of *habeas corpus,* asking that he be delivered from imprisonment which he asserted to be illegal.

After referring first to the treaty of 1868 with the Sioux Tribes, 15 Stat. 635, and the agreement of 1877, 19 Stat. 254, Art. 8, which provided that "Congress shall, by appropriate legislation, secure to them [Sioux Tribes] an orderly government", the Supreme Court stated, 109 U.S. at page 568, 3 S.Ct. at page 404:

"The pledge to secure to these people, with whom the United States was contracting as a distinct political body, an orderly government, by appropriate legislation thereafter to be framed and enacted, necessarily implies, having regard to all the circumstances attending the transaction, that among the arts of civilized life, which it was the very purpose of all these arrangements to introduce and naturalize among them, was the highest and best of all, that of self-government, the regulation by themselves of their own domestic affairs, the maintenance of order and peace among their own members by the administration of their own laws and customs."

The court concluded, 109 U.S. at page 571, 3 S.Ct. at page 406:

"It is a case, too, of first impression, so far as we are advised; for, if the question has been mooted heretofore in any courts of the United States, the jurisdiction has never before been practically asserted as in the present instance. The provisions now contained in sections 2145 and 2146 of the Revised Statutes [25 U.S.C.A. §§ 217, 218] were first enacted in section 25 of the Indian Intercourse Act of 1834, 4 St. 733. Prior to that, by the act of 1796, (1 St. 479,) and the act of 1802, (2 St. 139,) *offenses committed by Indians against white persons, and by white persons against Indians, were specifically enumerated and defined, and those by Indians against each other were left to be dealt with by each tribe*

*for itself, according to its local customs.* [Emphasis supplied.] The policy of the government in that respect has been uniform. As was said by Mr. Justice Miller, delivering the opinion of the court in United States v. Joseph, 94 U.S. 614, 617 [24 L.Ed. 295]:

" 'The tribes for whom the act of 1834 was made were those semi-independent tribes whom our government has always recognized as exempt from our laws, whether within or without the limits of an organized state or territory, and, in regard to their domestic government, left to their own rules and traditions, in whom we have recognized the capacity to make treaties, and with whom the governments, state and national, deal, with a few exceptions only, in their national or tribal character, and not as individuals.'

" * * * It results that the first district court of Dakota was without jurisdiction to find or try the indictment against the prisoner, that the conviction and sentence are void, and that his imprisonment is illegal."

Later, as will be further developed herein, the federal government, by Congressional Act, took jurisdiction of some of the major crimes, including that of murder, which was involved in Ex parte Crow Dog.

As late as 1940 the Supreme Court, in the case of United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894, recognized the *quasi* sovereignty of Indian nations in holding that they possessed the sovereign exemption from suits and from cross-complaints excepting where authorized. Quoting from page 512 of 309 U.S., page 656 of 60 S.Ct.:

"The public policy which exempted the dependent as well as the dominant sovereignties from suit without consent continues this immunity even after dissolution of the tribal government. These Indian Nations are exempt from suit without Congressional authorization. It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did. Possessing this immunity from direct suit, we are of the opinion it possesses a similar immunity from cross-suits."

█ We accordingly are of the opinion that the plaintiffs cannot prevail on their second point. We hold that Indian tribes, such as the defendant Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota, still possess their inherent sovereignty excepting only where it has been specifically taken from them, either by treaty or by Congressional Act.

█ *3. The court erred in its finding that defendants' courts are provided for under the federal constitution.*

The plaintiffs would argue that there is found no provision in the Federal Constitution for Indian courts. None is necessary. As already indicated, the Constitution, by authorizing Congress to regulate commerce with the Indian tribes and by authorizing the making of treaties with them, while not in and of itself *establishing* the sovereignty of the tribes, nevertheless does *recognize* their sovereignty. As interpreted by the United States Supreme Court, that sovereignty is absolute excepting only as to such rights as are taken away by the paramount government, the United States. Under this view, not even a Congressional Act would be necessary to establish the legality of the Oglala Sioux Tribal Courts. However, regulatory powers over these judicial establishments have been exercised to promote uniformity, gradual assimilation and other ends.

█ *4. The court erred in its findings that defendants' courts have been authorized by federal legislative action.*

In 1883, Congress passed R.S.Section 463, 25 U.S.C.A. § 2, which provided as follows:

"The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."

That Indian courts are authorized by Congress under the foregoing section and companion sections was held in United States v. Clapox, D.C.D.Or.1888, 35 F. 575. In the Clapox case, the defendants were charged with having broken into a reservation jail to free a prisoner confined therein while awaiting trial before the reservation court. The issue was whether the defendants were guilty of the federal offense of having freed a person committed for a crime against the United States. The court held that the general authority given by R.S.Section 463, 25 U.S.C.A. § 2, and companion statutes authorized rules of government for the Indians on the reservation, including establishment of an Indian court and police for the enforcement of police regulations, to take cognizance of offenses designated as "Indian offenses", and gave authority to define such offenses. The court stated, 35 F. at page 579:

"* * * the act with which these defendants are charged is in flagrant opposition to the authority of the United States on this reservation, and directly subversive of this laudable effort to accustom and educate these Indians in the habit and knowledge of self-government. It is therefore appropriate and needful that the power and name of the government of the United States should be invoked to restrain and punish them. The case falls within the letter of the statute (section 5401, Rev.St.) providing for the punishment of persons who are guilty of rescuing any one committed for an offense against the Unit-

ed States, and I see no reason why it should be construed out of it, or the statute held inapplicable to it."

In 1888, the Congress, in passing the Indian Department Appropriations Act, June 29, 1888, 25 Stat. 233, provided for compensation for judges of Indian courts. Continuously since that time the Congress has made appropriations for maintaining law and order among Indians, *including pay and other expenses of judges of Indian courts,* Indian police and employees engaged in suppression of traffic in intoxicating liquors and deleterious drugs among the Indians.

The Bureau of Indian Affairs Authorization Act, 42 Stat. 209, 1921, 25 U.S.C.A. § 13, is particularly significant. It provided:

"The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate * * * for the following purposes:

* * * * *

"For the employment of inspectors, supervisors, superintendents, clerks, field matrons, farmers, physicians, Indian police, *Indian judges,* and other employees." (Emphasis supplied.)

This statute is still in effect and appropriations for the Indian Bureau are currently being made under its authority. That Congress specifically recognizes the authority of Indian Tribal Courts becomes patent from the provisions of Section 1152 of Title 18 U.S. C.A.

"*§ 1152. Laws governing.* Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

*"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe,* or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively." (Emphasis supplied.)

We must conclude that the trial court was eminently correct in its statement, at page 19, that:

"There can be little doubt * * * that Congress has actually authorized the establishment and operation of the Ogallala Sioux Tribal Court."

And at page 23:

"In this case plaintiffs are virtually asking this court to break a line of decisions stretching over a period of more than one hundred years. Their request for the termination of tribal criminal jurisdiction is not founded on law but rather on their views of wise governmental policy. Such views should be presented to the legislative branches of our government, rather than to the courts. This issue has been a controversial subject in the halls of Congress. A constitutional amendment to strike the Indian Commerce Clause has been under consideration. S.J.Res. 4, 83rd Congress. In addition, only a year ago, Congress adopted legislation which permits the several states to extend their criminal and civil jurisdiction over Indians on Indian reservations. 67 Stat. 589, 28 U.S.C.A. § 1360 and note; 18 U.S.C.A. § 1162. The President, though signing a measure because of certain other features, criticized that provision under which states, including South Dakota, were given the power to extend their jurisdiction without consulting the Indians affected.

As of today, the forum in which plaintiffs could proceed to change the existing relationship between our Indian people, the State of South Dakota, and the federal government, is the Legislature of the State of South Dakota. The legislature, not the judiciary, is the branch of government having power to affect the changes in the law which plaintiffs urge upon the court in this case."

Originally, and until 1885, all offenses committed by Indians against Indians within the confines of Indian country were under the jurisdiction of the Tribal Courts. In 1885 Congress passed what is sometimes referred to as the "Seven Major Crimes Act". Therein, 23 Stat. 362, 385, Mar. 3, 1885, Ch. 341, Sec. 9, 18 U.S.C.A. § 548, Congress brought under federal jurisdiction the crimes of murder, manslaughter, rape, assault with intent to kill, arson, burglary and larceny. Subsequently three additional crimes were included, to-wit: incest, assault with a dangerous weapon and robbery. The clear inference is that Congress left to the Indian Tribal Courts jurisdiction over all crimes not taken by the federal government itself. See State v. McClure, 1954, 127 Mont. 534, 268 P.2d 629, 635; United States v. Quiver, 1916, 241 U.S. 602, 605, 36 S.Ct. 699, 60 L.Ed. 1196. We accordingly hold that not only do the Indian Tribal Courts have inherent jurisdiction over all matters not taken over by the federal government, but that federal legislative action and rules promulgated thereunder support the authority of the Tribal Courts.

■ *5. The court erred in its finding that the defendants have sovereign authority to set up a system of courts with civil and criminal jurisdiction over citizens of the United States of America, and the State of South Dakota.*

This brings into the foreground the question of whether the granting of citizenship to the Indians has changed the status of Tribal Courts.

Prior to 1924 only some Indians possessed citizenship and that by reason of treaties between the United States and the Indian tribes or by special statute. The Act of June 2, 1924, 43 Stat. 253, 8 U.S.C.A. § 3, (now included in 8 U.S.C.A. § 1401) provided as follows:

"That all noncitizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States: *Provided,* That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property."

Plaintiffs argue that as citizens of the United States they should have the right of free access to the courts of justice of the several states and that such right is, in its nature, independent of the will of any state. Plaintiffs claim that as citizens they, " * * * have the right to prosecute and defend actions in the courts of the commonwealth according to the established rules of procedure * * * ". The Supreme Court has answered this question in several cases. See United States v. Nice, 1916, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192. That case arose out of the prosecution of the defendant on a charge of having sold liquor to an Indian. The defense was that the Indian purchaser was a citizen. The lower court sustained a demurrer to the indictment and appeal was taken directly to the Supreme Court. Quoting from page 598 of 241 U.S., page 697 of 36 S.Ct.:

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one *sui juris,* the tribal relation may be dissolved and the national guardianship brought to an end, but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial. *Citizenship is not incompatible with tribal existence or continued guardianship, and so may be conferred without completely emancipating the Indians,* or placing them beyond the reach of congressional regulations adopted for their protection. [Citations.] Thus, in United States v. Holliday [3 Wall. 407, 18 L.Ed. 182], a prosecution for selling spirituous liquor to a tribal Indian in Michigan when not on a reservation, the contention that he had become a citizen was dismissed as 'immaterial;' in Hallowell v. United States [221 U.S. 317, 324, 31 S.Ct. 587, 55 L.Ed. 730], a prosecution for taking whisky upon an allotment held by a tribal Indian in Nebraska, the fact that he had been made a citizen was held not to take the case out of the congressional power of regulation; and in United States v. Sandoval [231 U.S. 28, 48, 34 S.Ct. 1, 58 L.Ed. 107], a prosecution for introducing intoxicating liquors into an Indian pueblo in New Mexico, it was held that whether the Indians of the pueblo were citizens need not be considered, because that would not take from Congress the power to prohibit the introduction of such liquors among them." (Emphasis supplied.)

See, also, Winton v. Amos, 1921, 255 U.S. 373, 391–392, 41 S.Ct. 342, 349, 65 L.Ed. 684:

"It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property. The guardianship arises from their condition of tutelage or dependency; and it rests with Congress to determine when the relationship shall cease; *the mere grant of rights of citizenship not being sufficient to terminate it.* Lone Wolf v. Hitchcock, 187 U.S. 553, 564, et seq., 23 S.Ct. 216, 47 L.Ed. 299;

98

Tiger v. Western Inv. Co., 221 U.S. 286, 310–316, 31 S.Ct. 578, 55 L.Ed. 738." (Emphasis supplied.)

That Congress did not intend by the granting of citizenship to all Indians born in the United States to terminate the Indian Tribal Court system is patent from the fact that at the same session of Congress and at sessions continuouly subsequent thereto funds have been appropriated for the maintenance of the Indian Tribal Courts. We hold that the granting of citizenship in itself did not destroy tribal existence or the existence or jurisdiction of the Indian Tribal Courts and that there was no intention on the part of Congress so to do.

■ *6. The court erred in its findings that defendants have power and authority to levy taxes on citizens of the United States of America and the State of South Dakota.*

A similar question was presented to this court in Buster v. Wright, 8 Cir., 1905, 135 F. 947, appeal dismissed 203 U.S. 599, 27 S.Ct. 777, 51 L.Ed. 334. That case involved the validity of a permit tax of the Creek Nation for the privilege which it offered to those who were not citizens of its nation of trading within its borders. In upholding the right of the Creek Nation to enforce the tax, Judge Walter H. Sanborn, speaking for the court, said, 135 F. at page 950:

"The authority of the Creek Nation to prescribe the terms upon which noncitizens may transact business within its borders did not have its origin in act of Congress, treaty, or agreement of the United States. It was one of the inherent and essential attributes of its original sovereignty. It was a natural right of that people, indispensable to its autonomy as a distinct tribe or nation, and it must remain an attribute of its government until by the agreement of the nation itself or by the superior power of the republic it is taken from it. Nei-

ther the authority nor the power of the United States to license its citizens to trade in the Creek Nation, with or without the consent of that tribe, is in issue in this case, because the complainants have no such licenses. The plenary power and lawful authority of the government of the United States by license, by treaty, or by act of Congress to take from the Creek Nation every vestige of its original or acquired governmental authority and power may be admitted, and for the purposes of this decision are here conceded. *The fact remains nevertheless that every original attribute of the government of the Creek Nation still exists intact which has not been destroyed or limited by act of Congress or by the contracts of the Creek tribe itself.* [Emphasis supplied.]

"Originally an independent tribe, the superior power of the republic early reduced this Indian people to a 'domestic, dependent nation' (Cherokee Nation v. State of Georgia, 5 Pet. 1–20, 8 L.Ed. 25), yet left it a distinct political entity, clothed with ample authority to govern its inhabitants and to manage its domestic affairs through officers of its own selection, who under a Constitution modeled after that of the United States, exercised legislative, executive, and judicial functions within its territorial jurisdiction for more than half a century."

We approve of the statement in Cohen's Handbook of Federal Indian Law, page 142, as follows:

"One of the powers essential to the maintenance of any government is the power to levy taxes. That this power is an inherent attribute of tribal sovereignty which continues unless withdrawn or limited by treaty or by act of Congress is a proposition which has never been successfully disputed." Citing Buster v. Wright, supra, and Morris v. Hitchcock, 1903, 21 App.D.C. 565,

affirmed 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030.

Inasmuch as it has never been taken from it, the defendant Oglala Sioux Tribe possesses the power of taxation which is an inherent incident of its sovereignty. The tribe has seen fit to give orderly implementation to that power through the adoption of a constitution which, among other things, has specifically provided for the levy of taxes. Such action was taken in accordance with the provisions of the Indian Reorganization Act, 1934, 48 Stat. 987, 25 U.S.C.A. § 476.

We conclude from the original precept of tribal sovereignty and the fact that the power of the Oglala Sioux Tribe to impose the tax or license in question has not been pretermitted by any federal statute or agency ruling thereunder, but, to the contrary, has been implemented by the Indian Reorganization Act, supra, that such power still exists.

This case is in all things affirmed.