## IN RE THE ESTATE OF GEORGE HANDLEY.

SARAH A. CHAPMAN, AND OTHERS, APPELLANTS, *v.*
JOHN HANDLEY, AND OTHERS, RESPONDENTS.

CONSTRUCTION OF STATUTES.—CONGRESSIONAL ANNULLMENT.—ANTI-
POLYGAMY LAW.—ILLEGITIMATE CHILDREN.—The Territorial
Act of March 3, 1852, provided that illegitimate children and
their mothers inherit from the father in the same manner as
legitimate children and the wife, and the Anti-Polygamy Law
of 1862 provided that all acts and parts of acts theretofore
passed by the Utah Legislature "which establish, support,
maintain, shield or countenance polygamy" were annulled;
*held,* that the second mentioned act annulled the first, and
that an illegitimate child born after the passage of the act of
1862, where the descent was cast prior to 1882, did not inherit.
BLACKBURN, J., dissenting.

APPEAL from a judgment of the district court of the
third district. The opinion states the facts, except the
following, which are pertinent:

The Territorial Legislature passed no act on this sub-
ject after the Anti-Polygamy Law of 1862 was passed
until the act of 1876 (Utah Compiled Laws, 1876, § 714),
which is as follows: "Every illegitimate child is in all
cases an heir to its mother. It is also an heir to its
father when acknowledged by him. If an illegitimate
child die intestate, without leaving issue or husband or
wife, its estate goes to its mother, or in case of her
decease, to her heirs-at-law."

The next act upon the subject was a Congressional
statute, the Edmunds Law (22 Stat. at Large, 31), which
in the seventh section thereof legitimates the issue of

4

polygamous Mormon marriages born prior to January 1, 1883.

Then, in 1884, a Territorial statute was passed (Compiled Laws, 1888, §§ 2742, 2743), which is: "Every illegitimate child is an heir of the person who acknowledges himself to be the father of such child; and in all cases is an heir of his mother, and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock. The issue of all marriages null in law or dissolved by divorce are legitimate."

Next followed the Edmunds-Tucker Law (24 Stat. at Large, 635), section 11 of which provides: "That all laws enacted by the Legislative Assembly of the Territory of Utah which provide for or recognize the capacity of illegitimate children to inherit or to be entitled to any distributive share in the estate of the father of any such illegitimate child are hereby disapproved and annulled, and no illegitimate child shall hereafter be entitled to inherit from his or her father, or to receive any distributive share in the estate of his or her father," with a saving clause as to all children legitimated by the Edmunds Law, and as to all others born within twelve months after the passage of this act. See next case, and *Cope* v. *Cope*, 137 U. S. 682.

*Messrs. Sutherland and Judd,* for the appellants.

*Messrs. Hoge and Burmester* and *Mr. Arthur Brown,* for the respondents.

HENDERSON, J.:

The appellants, Ruth A. Newson, Benjamin T. Handley, Harry L. Handley, and Sarah A. Chapman, peti-

tioned the probate court for a distributive share of the estate of George Handley, deceased, as his heirs at law. Their petition was denied in the probate court, and they appealed to the district court, where the judgment of the probate court was affirmed, and they appeal to this court. The facts are that George Handley died intestate on the 25th day of May, 1874, leaving an estate valued at $25,-000. He left surviving him Elizabeth Handley, his widow, and eight children, named, respectively, John Handley, William Handley, Charles J. Handley, Emma N. Handley, Mary F. Handley, Ruth A. Newson, Benjamin T. Handley, and Harry F. Handley; the last three of whom are petitioners and appellants herein. The first four children above named were all children of the deceased and Elizabeth Handley, his lawful wife, and the last four were children of the said deceased and Sarah Chapman, his plural wife, married to him according to the tenets and rites of the Mormon church, and were the fruit of that polygamous relation. All these children are still living except Mary, one of the polygamous wife's children, who died sole and intestate September 28, 1879, and her mother, Sarah A. Chapman, has succeeded to her interests. The petitioners and appellants, therefore, are the polygamous children and the polygamous wife (the latter claiming as heir of her deceased daughter) of the deceased, and the only question presented by the record is whether the surving polygamous, or illegitimate, children are heirs at law of the deceased, and entitled to share in his estate the same as the children born in lawful wedlock. The appellants base their claim upon the provision of an act of the Territorial Legislature approved March 3, 1852 (Comp. Laws, 1876, pp. 268, 269, § 677), which reads as follows:

"Illegitimate children and their mothers inherit in like manner from the father, whether acknowledged by him

or not, provided it shall be made to appear to the satis-faction of the court that he was the father of such ille-gitimate child or children."

This statute, so far as Territorial enactments are con-cerned, was the one in force at the time of decedent's death. On the part of the respondents it is contended: *First,* that this statute was annulled by the anti-polygamy act of Congress, approved July 1, 1862; *second,* that the act is against public policy, and therefore void. The anti-polygamy act above referred to is as follows:

"Be it enacted by the Senate and House of Repre-sentatives of the United States of America in Congress assembled, that every person having a husband or wife living who shall marry any other person, whether mar-ried or single, in a territory of the United States, or other place over which the United States have exclusive jurisdiction, shall, except in the cases specified in the proviso of this section, be adjudged guilty of bigamy, and upon conviction thereof shall be punished by a fine not exceeding five hundred dollars, and by imprisonment for a term not exceeding five years: *Provided,* neverthe-less, that this section shall not extend to any person by reason of any former marriage whose husband or wife by such marriage shall have been absent for five successive years without being known to such person within that time to be living; nor to any person by reason of any former marriage which shall have been dissolved by the decree of a competent court; nor to any person by reason of any former marriage which shall have been annulled or pronounced void by the sentence or decree of a com-petent court on the ground of the nullity of the marriage contract.

"SEC. 2. And be it further enacted that the following ordinance of the provisional government of the State of Deseret, so called, namely, 'An ordinance incorporating

the Church of Jesus Christ of Latter Day Saints,' passed
February 8, in the year eighteen hundred and fifty-one,
and adopted, re-enacted, and made valid by the Governor
and Legislative Assembly of the Territory of Utah by an
act passed January 19, in the year eighteen hundred and
fifty-five, entitled 'An act in relation to the compilation
and revision of the laws and resolutions in force in Utah
Territory, their publication and distribution,' and all
other acts and parts of acts heretofore passed by the
said Legislative Assembly of the Territory of Utah which
establish, support, maintain, shield, or countenance
polygamy, be, and the same are hereby, disapproved and
annulled: *Provided*, that this act shall be so limited and
construed as not to affect or interfere with the right of
property legally acquired under the ordinance heretofore
mentioned, nor with the right ' to worship God accord-
ing to the dictates of conscience,' but to only annul all
acts and laws which establish, maintain, protect, or
countenance the practice of polygamy, evasively called
'spiritual marriage,' however disguised by legal or eccle-
siastical solemnities, sacraments, ceremonies, consecration,
or other contrivances."

By the organic act approved September 9, 1850, relat-
ing specially to Utah, Congress conferred upon the Terri-
torial Legislature the right to legislate upon "all right-
ful subjects of legislation," but reserved to itself the
right to disapprove, and thereby annul. Congress being
the supreme legislative authority over the Territories, it
would have this right of disapproval, and to annul any
Territorial law, whether it was reserved or not. *Bank* v.
*County of Yankton*, 101 U. S. 129. If, therefore, the
Territorial statute above quoted, or that part of it which
provides that illegitimate children inherit from their
father, was disapproved and annulled by the anti-polyg-
amy act, above quoted, then the petitioner's claim is

properly denied, and this question is solved by determining the character of the Territorial act. Is it an act, or "part of an act," which establishes, supports, maintains, shields, or countenances polygamy? In determining the character and meaning of a legislative act, the surrounding circumstances existing at the time of its passage, as shown by contemporaneous history, should be considered. Endlich, in his work on the Interpretation of Statutes (section 29), thus states the rule:

"The interpreter, in order to understand the subject-matter and the scope and object of the enactment, must, in Coke's words, ascertain what was the mischief or defects for which the law had not provided; that is, he must. call to his aid all those external or historical facts which. are necessary for that purpose, and which led to the enactment. He must refer to the history of the times to ascertain the reason for and the meaning of the provisions of the statute, and to the general state of opinion, public, judicial, and legislative, at the time of the enactment.     *     *     *     For this purpose, the court, in interpreting the statute, will take judicial notice of contemporaneous history, or it may consult contemporary or other authentic works or writings."

In determining the meaning and effect of this statute, therefore, we are to consider that at the time the statute was passed the Territory had but recently been settled and organized; that it was inhabited almost exclusively by people who believed in polygamy and plurality of wives and families as a part of their religious faith, and that its practice was common among them; that the legislative bodies elected by these people sought to support, shield, maintain, and countenance it. The result of polygamy as a practice would be what would be known to the law as "illegitimate children;" indeed, that would be its fruit. There was no provision of law by which

these illegitimate children or their mothers could inherit from the father. This was the unquestioned condition in this Territory when this statute was enacted, and in view of it I have no doubt that it was intended to, and did tend to, support, maintain, and countenance polygamy. Imagine a woman approached with a proposition of polygamy, under such circumstances; no public sentiment against it to deter or hinder. The anxious inquiry would be as to the legal *status* and rights of herself and children. By this statute they were provided for. But it is contended that it would tend to deter men from entering into polygamy, and would tend to create a sentiment against it on the part of legal wives; but this would not be so as to people who believe in it. It cannot be doubted that if polygamy was right this would be a proper provision, and its advocates must so regard it.

It is further contended that the provisions of the Territorial statute in favor of illegitimate children is a proper measure for the protection of an unfortunate and innocent class of persons, and that the act of Congress should not be construed to prevent it; that it was not the intention of Congress to go beyond the guilty parties in imposing penalties or inflicting punishments. This view has been urged most eloquently, and with great ability, by the learned counsel for the appellants. It must be understood that Congress was legislating against polygamy as an institution; that it intended to disapprove of all that tended to establish, support, countenance, or maintain it; sought to lessen and prevent injustice to illegitimate children by breaking up and destroying the system that applied to and produced them. In monogamous communities, as is well understood, the universal moral sentiment makes a plain distinction between the "ill begotten" and the "lawful born," and, however much we may pity and sympathize with the innocent sufferers

from this sentiment, it must be acknowledged that its existence is one of the potent factors in preventing social and sexual irregularities. Congress has recognized the potency of denying to illegitimate children the rights of legitimacy and inheritance as a means of breaking up and discouraging polygamy in the acts of 1882 and 1887. By 22 St. at Large, 31, and 24 St. at Large, 637, it is provided that illegitimate children begotten thereafter shall not inherit; and so emphatic is the language of the latter act that it may well be doubted whether testamentary provision can be made for them.

On the argument it was contended that the law of 1882, *supra,* provided that illegitimate children begotten thereafter should not inherit; that this would have been unnecessary if Congress had, as contended, in 1862, annulled the Territorial act, and this is claimed as evidence that Congress did not so construe the law of 1862. But it will be seen that the act of 1882 legitimates polygamous children begotten before its passage. If under the Territorial law they already inherited "in like manner" as legitimate children, this would have been unnecessary. To my mind, all this is only evidence that Congress intended to legislate upon all these subjects for itself primarily, and without reference to the Territorial enactments, except to disapprove and annul all acts or parts of acts thereof which tend to encourage or countenance polygamy. It is contended, Congress did not intend to annul this Territorial provision, and did not regard it as one of the acts that countenanced and protected polygamy, because it has at least twice made similar provisions, but the acts referred to only legitimate children born before and within a short period after the passage of the act. The object of extending the provisions to children born within a few months after the act, placing them on an equality with those born before, is

too obvious to require mention. Substantially, these acts only legitimate children begotten prior to their passage and publication. It is a concession in favor of illegitimates then begotten, and, as before stated, this is coupled with a provision denying the right of inheritance to those begotten thereafter. The Territorial act, on the contrary, establishes a continuing rule that runs with the future. In this respect there is the same difference between the Territorial and Federal acts that there would be between a pardon granted for a past offense and a commission to go forth and commit an offense in the future with impunity. I am of the opinion that the Territorial act was disapproved and annulled by the anti-polygamy act above referred to, and that the judgment appealed from should be affirmed.

ZANE, C. J., concurred.

BLACKBURN, J., *(dissenting)*:

I am compelled to dissent from the opinion of the court. The facts are not in dispute, and are as stated. The only question is, was the law such in 1874, when the decedent died, that an illegitimate or polygamous child was entitled to share in his father's estate? By the law of 1852 of the Territory of Utah, "illegitimate children * * * inherit in like manner from the father, whether acknowledged by him or not, provided it shall be made to appear to the satisfaction of the court that he was the father of such illegitimate child or children." "In like manner" (referring to other portions of the act) means as legitimate children. There is no question made, nor could any be successfully made, that the rights of illegitimate children are a rightful subject of legislation. Therefore, if this law was in force at the time, in 1874, when the decedent died, there can

be no doubt that the appellants were entitled to a share of their father's estate. It was in force so far as any act of the Territorial Legislature at that time was concerned,. for it had not been repealed or changed by that body. But the contention of the respondents is that it was annulled by the act of Congress of 1862, found in 1 Comp. Laws Utah, p. 109, § 2, which annuls the act in the Territory of Utah incorporating the Church of Jesus Christ of Latter-Day Saints, and all other acts or parts of acts heretofore passed by said Legislative Assembly of the Territory of Utah which establish, support, maintain, shield, or countenance polygamy by providing that the purpose of this act shall be "only to annul all acts and laws which establish, maintain, protect, or countenance the practice of polygamy, evasively called 'spiritual marriage,' however disguised by legal or ecclesiastical solemnities, sacraments, ceremonies, consecrations, or other contrivances." It is contended that the act of Congress annuls the act of the Legislature of Utah giving the right to illegitimate children to share in the father's estate, because such right of inheritance supports, maintains, and encourages polygamy.

The purpose of the act of Congress of 1862 was to define and punish polygamy, and to annul all laws of the Territory in any way making it legal or giving it countenance and support. Nothing is said in the act of Congress in reference to the rights of illegitimate children,. and if that subject was in the mind of Congress it would have been expressed, and not left in doubt or uncertainty. Courts do not favor the repeal of laws by implication, and laws are never interpreted to repeal former laws, unless the two are so repugnant that they cannot both be administered and allowed to stand. *U. S.* v. *Sixty-Seven Packages*, 17 How. 85; *Red Rock* v. *Henry*, 106 U. S. 596, 1 Sup. Ct. Rep. 434; *Ex parte, Crow Dog,.*

109 U. S. 556, 3 Sup. Ct. Rep. 396; *Chew Heong* v. *U. S.*, 112 U. S. 556, 5 Sup. Ct. Rep. 255. And certainly the same course of interpretation applies with equal, if not more, force to the annulling of laws. The law of the Territory was before the Congress, and how much easier it would have been to annul this Territorial act by name, if it had intended that, than to have left its annulling to judicial interpretation by a sweeping clause that reads more like the rounding up of sentences in a stump speech than a solemn act of the highest legislature of the nation. This law of inheritance was before Congress, and if the meaning is to be given to these general words claimed, it clearly abdicated its functions, and left to the courts to make and annul laws by judicial interpretation. It cannot be supposed Congress intended any such thing. Courts are human, and sometimes not overburdened with wisdom, and it would be, if such a thing can be supposed, a more dangerous exercise of legislative authority to form laws so as to leave to judicial interpretation their enlargement and annulling. Where the law would begin, and where it would end, would be left to conjecture and uncertainty. The law is uncertain enough interpreted as best it may be by the courts; and if the interpretation contended for was given, conjecture and uncertainty would be vastly increased. "It is always to be presumed that the Legislature when it entertains an intention will express it, and that in clear and explicit terms." Potter's Dwar. St. 219. If this Territorial law is annulled, a right is taken away, and all such laws are in the nature of a penalty, and are *stricti juris,* and are not to be extended by intendment.

Another course of construction in such statutes is that where general words follow the enumeration of particular cases such general words are held to apply to cases of the same kind as particularly mentioned; for example,

"An act of pasturement provided that whoever stole sheep or other cattle should be deprived of the benefit of clergy; and the courts held that 'other cattle' only meant sheep." Id. 220–227. The words of the acts of Congress that is claimed annul the act of the Utah Legislature are, "which establish, support, maintain, shield, or countenance polygamy," etc. Afterwards there are words of explanation, but words of explanation cannot enlarge the meaning of the words they are intended to explain. These words are to be interpreted according to their common or ordinary meaning. Allowing illegitimate children to inherit from their fathers does not establish polygamy; does not support it; does not maintain it; does not shield it; does not countenance it; for it is consistent with the severest punishment of polygamy and its entire overthrow that illegitimate children should inherit from their fathers. Therefore, I do not think it repeals or annuls the act of the Territorial Legislature giving to illegitimate children the right to inherit. I am strengthened in this opinion by the act of Congress of 1882 (called the "Edmunds Act"), § 7. That clearly shows that it was not the intention of Congress to disinherit polygamous children, for it says all polygamous children born before the 1st day of January, 1883, shall be legitimate, making it clear that in the mind of Congress nothing was intended by the act of 1862 to disinherit polygamous children. The act of the Legislature of Utah says nothing about polygamous children. It only says illegitimate children, but the act of Congress goes further, and says polygamous children shall be legitimate. If, therefore, the Territorial law, by inference, encouraged and countenanced polygamy, much more did the law of Congress, and that idea cannot be entertained for one moment. Again, the act of Congress of 1887, in the eleventh section, provides that no illegitimate children

shall thereafter inherit from their parents, and annuls all laws of the Territory in reference thereto, but continues the power to inherit to all children born within twelve months after the passage of this act. So that if allowing illegitimate children to inherit from their fathers encourages polygamy, Congress is guilty of fostering that institution; for the period of gestation is nine months. That leaves three months for men to beget illegitimate children, and encourages polygamy for that length of time. But does, in the nature of things, the permission of illegitimate children to inherit of their fathers encourage or countenance polygamy? If so, how? It would certainly increase the hostility of the lawful wife to polygamy, and the opposition of her children, for it would lessen their inheritance, and it would not increase the man's passions or his love of lechery and dissoluteness. It only takes from the illegitimate the stain of bastardy, and places it on a plane where it will not be an outcast without recognized relationship or family.

Looking over these statutes, and remembering the condition of things in the Territory of Utah at the time, I am forced to the opinion that the act of Congress of 1862 did not annul the act of the Legislature of Utah of 1852, allowing illegitimate children to inherit. It certainly did not in terms, and can be made to only by an interpretation that amounts to judicial legislation. Why should Congress leave to the courts to hunt out the laws of the Territory it intended to annul, when the laws of the Territory were before it? Whose duty was it to point out the laws that maintain and encourage polygamy, the Congress' or the courts'? If Congress pointed them out, the question was definitely settled. If left to the courts uncertainty would arise, and differences of interpretation would invariably occur, and the administration of the law would be rendered uncertain. These remarks only

show that it could not have been the intention of Congress to leave to judicial acumen the finding of those laws of the Territory that might be thought to maintain and encourage polygamy. It is said, however, that that part of the law which allows the mother of illegitimate children to inherit clearly encourages polygamy. That question is not in this case, and if courts decide the questions before them they will be busy enough. But it may be remarked that it does not follow that because the mothers of illegitimate children are allowed to inherit encourages polygamy, the inheritance of their children would or does encourage that vile practice. The Congress may have had in mind the allowance of mothers of illegitimate children to inherit when it used the expression "parts of laws." I do not think it follows that Congress, when it passed the law of 1862, had in mind the right of illegitimate children to inherit from their fathers, as encouraging and supporting polygamy, because it was well known at that time that it was extensively practiced in Utah Territory. The right of illegitimate children to inherit from their fathers has been universally upheld and permitted from 1852 until now, and the title to much property is based upon its validity, and courts will not and ought not to declare that law invalid without weighty reasons. I think the law of the Territorial Legislature of 1852 was in force at the time Lewis Handley died, and that the appellants are entitled to share in his estate.