STATE OF NEBRASKA, APPELLEE, V. WILLIAM RALPH
HOLLOWAY, APPELLANT.

187 N. W. 2d 85

Filed May 21, 1971.   No. 37356.

A. Q. Wolf and Bennett G. Hornstein, for appellant.

Clarence A. H. Meyer, Attorney General, and Betsy G. Berger, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

McCOWN, J.

A jury found William Ralph Holloway guilty of the robbery of a bartender at a tavern in South Omaha, Nebraska. He was sentenced to 10 years imprisonment and this appeal followed.

At approximately 9 p.m., on December 13, 1968, three negro males held up and robbed the bartender and patrons of Little Paul's tavern. The robbers used a sawed-off shotgun and handguns and departed with money and personal effects, including men's and women's billfolds.

The robbery was one of a series of robberies which had occurred in Omaha. The police had been investigating the former robberies on December 12, 1968, and again on December 13, 1968. The police believed that following a robbery, the robbers might go to a brick dwelling at 5425 South 29th Avenue, which was the residence of Christabelle Jenkins.

At approximately 4 p.m., on the afternoon of December 13, 1968, Sgt. Barrett executed a sworn affidavit for the issuance of a search warrant for a 12-gauge sawed-off shotgun, assorted pistols and handguns. The affidavit alleged that the sole and only reasons for his belief that the guns were concealed or kept on the described premises was "information received from an

informant whose information has been reliable in the past." The judge of the municipal court issued a search warrant for the described property, reciting that "the following grounds exist for issuance of a search warrant, to-wit: Reliable information received from an informant whose information has been reliable in the past."

At approximately 6 or 7 p.m., the police began surveillance of the residence of Christabelle Jenkins from a distance of a half block. At approximately 9:15 p.m., the officers in the car heard a police radio report of a robbery at Little Paul's tavern. They left the residence for 15 or 20 minutes. Shortly after the return of the police officers to the front of the Jenkins residence, two negro males came out of the house. They were arrested by other officers some 300 feet east of the residence. The police, with their search warrant, went to the door of the residence. A 15-year-old son of Mrs. Jenkins came to the door. The police showed him the search warrant and he let them in. As they entered, they met the defendant coming down the stairs. He was arrested on the spot. In the front upstairs bedroom, lying on the bed, was a sawed-off shotgun, assorted cards and papers, men's billfolds and ladies' billfolds and purses.

Mrs. Jenkins lived in the house with her four children. She was the sole tenant and they were the only persons who lived in the house. Sgt. Coleman of the police department had been acquainted with her all of her life.

Mrs. Jenkins was not at home at the time the defendant was arrested. She was found at the Workmen's Club. Sgt. Coleman, together with Sgt. Dailey, left the Jenkins house and went to the Workmen's Club. There in the manager's office, Coleman testified that he told her that he had a search warrant for her house and he thought she should come with them. She said he didn't need anything to search her home; that she was willing to let them search. She did not remember whether they had told her· they had a search warrant or. not.

She rode with the police officers to her home and when they got there, she invited Coleman and Dailey into the house. She told them that she wanted to cooperate. When they entered the home, other policemen were still there. Sgt. Coleman showed Mrs. Jenkins the items on the bed in the upstairs bedroom. She told the police to take whatever was there. Neither the defendant nor the other two men arrested had ever lived in the Jenkins house. One of them had never been in the house before. The defendant had frequently visited her home but she had not given him permission to enter her home at any time that day. There was no evidence as to how the defendant or the other men entered the house.

A motion to suppress the evidence seized in the Jenkins bedroom was heard prior to trial and was denied by the district court. The defendant was found guilty by the jury. He was sentenced to 10 years imprisonment.

The defendant contends that the motion to suppress the seized evidence should have been sustained. He argues first that the search warrant was invalid because the affidavit was unsupported by facts. The State apparently takes the position that all the factual information which the police had might possibly have been submitted to the magistrate outside the affidavit, and, therefore, probable cause should be assumed from the issuance of the warrant.

We think it only necessary to refer to section 29-814, R. R. S. 1943: "A warrant shall issue *only on affidavit* sworn to before the judge or magistrate and *establishing the grounds* for issuing the warrant. * * * It (the warrant) shall state the *grounds* or proper cause for its issuance and the name or names of the persons whose *affidavits* have been taken in support thereof." (Emphasis ours.)

The rule in this state is clear. In passing on validity of a search warrant the court may consider only in-

formation brought to the attention of the magistrate. For the affidavit of a tip from an informant to be sufficient the magistrate must be informed of (1) some of the underlying circumstances from which the informant concluded that the articles were located where he claimed they were, and (2) some of the underlying circumstances from which the officer concluded that the informant was credible. Affidavits for search warrants must be tested in a common sense, realistic fashion. State v. LeDent, 185 Neb. 380, 176 N. W. 2d 21; State v. Waits, 185 Neb. 780, 178 N. W. 2d 774.

The affidavit here recited a bare conclusion. It recited none of the underlying circumstances from which either the informant or affiant had concluded that the shotgun and handguns were located in the residence of Christabelle Jenkins. Neither did the affidavit reveal any of the underlying circumstances from which the officer making the affidavit concluded that the informant was credible or reliable. While it is not necessary that the informant be named, it is necessary that some facts going to establish probable cause be set out. Affidavits for search warrants must be tested in a common sense, realistic fashion. Nevertheless, a "recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684.

Even if the police collectively may have had sufficient facts to constitute probable cause, none of these underlying circumstances were set out in the affidavit. The inevitable consequence is that the affidavit was insufficient and the search warrant invalid. As long ago as 1933, Mr. Justice McReynolds, speaking for the Supreme Court, said: "Mere affirmance of belief or suspicion is not enough." Nathanson v. United States, 290 U. S. 41, 54 S. Ct. 11, 78 L. Ed. 159.

We do not agree with the defendant that the invalidity

of the search warrant in and of itself automatically makes the evidence seized inadmissible. We believe the evidence establishes a valid consent by the person who had a full right to consent and also establishes the defendant's lack of standing to complain.

We recognize that the State has the burden of establishing the legal sufficiency of a consent. Nevertheless, the existence and voluntariness of a consent is a question of fact. Here Christabelle Jenkins, the only proper person from whom a consent could be appropriately obtained, had known Sgt. Coleman all of her life. She did not even remember whether Sgt. Coleman had told her that he had a search warrant. Sgt. Coleman testified that when he told her he had a search warrant, she advised him he didn't need anything, and that she was willing to let him search her home. She told Coleman she wanted to cooperate and she invited Coleman and Dailey into the house when they arrived.

Even if there were a question as to the timing of the consent compared with the time of initial entry into the house, there can be no question whatever that Mrs. Jenkins specifically authorized and directed the police to seize and take the articles found in a bedroom of her home. A consent freely and intelligently given by the proper person may operate to eliminate any question otherwise existing as to the propriety of a search and seizure. See Maxwell v. Stephens, 348 F. 2d 325 (8th Cir., 1965).

There is no evidence as to how this defendant or either of the other two men got into the house nor as to who brought the articles into the home in the first place. If the consent of Christabelle Jenkins here were held ineffective, it would necessitate holding that the defendant was the only person who could validly consent to a search and seizure of articles found in a house other than his own, where he had no possessory or proprietary interest in either the real property searched or the personal property seized, and no reasonable expecta-

tion of personal privacy from governmental intrusion. We find no support for such a position.

The issue of standing here is inevitably wound up in the issue of consent. Jones v. United States, 362 U. S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697, in effect, extended standing to challenge legality to "anyone legitimately on premises where a search occurs * * *." In Mancusi v. DeForte, 392 U. S. 364, 88 S. Ct. 2120, 20 L. Ed. 2d 1154, the Supreme Court held that standing "depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." We cannot believe that in either Jones or Mancusi the court intended to extend standing to an interloper or trespasser, nor to one who should have had no reasonable expectation of privacy for himself in the particular area of the "house" involved. Emphatically this is so where the search and seizure involved articles and personal effects which were not the defendant's, but were instrumentalities or fruits of a crime with which the defendant was charged.

Under the facts here, we believe that there was a voluntary valid consent by the proper person, and that the defendant had no standing to challenge the legality of the search and seizure involved.

The defendant also asserts that the court erred in permitting the defense witness, Willie Joseph, to invoke the Fifth Amendment privilege against self-incrimination in response to questions designed to elicit that the witness had pleaded guilty to this particular robbery on the preceding day. The record does not show that a conviction had been entered by the court nor that there were no other charges or counts pending against the witness arising out of this robbery or connected matters.

Under the rule of Malloy v. Hogan, 378 U. S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653, it "must be perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the an-

swer(s) cannot possibly have such tendency to incriminate." Doubts should be resolved in favor of the witness. The court's action in sustaining the witness' claim of privilege was correct.

The defendant also contends that the court erred in permitting the State to elicit from the defendant on cross-examination, over defense objection and motion for mistrial, the nature of the crime, the date of the conviction, and the sentence received by the defendant on a prior felony conviction. The fact of a prior conviction had been admitted by the defendant on direct examination. In a series of questions and answers extending over more than a page of the record, the State was allowed to elicit, over vigorous objection and a motion for mistrial, the fact that the defendant was convicted of manslaughter in 1963, and that he was sentenced to 4 years imprisonment, the jury being cautioned by the court to disregard the testimony that he was sentenced to 4 years imprisonment. Evidence of prior crimes is ordinarily inadmissible against the defendant. Section 25-1214, R. R. S. 1943, permits an exception as to witnesses generally, but the exception is strictly limited. See Latham v. State, 152 Neb. 113, 40 N. W. 2d 522.

The court is evenly divided as to whether the cross-examination here was harmless or prejudicial error. Under such circumstances, the judgment of the district court must be affirmed.

AFFIRMED.

CARTER, J., not participating.

WHITE, C. J., concurring in result.

I concur in the result reached in this case. The defendant had no standing to raise the issue of the sufficiency of the affidavit of probable cause upon which the search warrant was issued. That portion of the opinion containing a discussion and holding that the affidavit of probable cause was invalid is pure dictum. As such, it is not binding on the court, in my opinion, and

can only serve to becloud similar issues in future cases. The broad principles governing such cases have long since been announced. In my opinion, shadows have been cast upon the validity of the breadth of the holdings in United States v. Ventresca, 380 U. S. 102, 85 S. Ct. 741, 13 L. Ed. 2d 684, and the following case of Aguilar v. United States, 363 F. 2d 379, cert. den., 388 U. S. 921, 87 S. Ct. 2119, 18 L. Ed. 2d 1369. Factual color matching of these cases is almost impossible. I feel that necessary steps to do so should be avoided as they would becloud the clarity of approach in future cases. As de Tocqueville reminded us in his classic statement on judicial power when a court goes beyond the necessary pronouncements of the law in the special cases before it, it may perhaps assert a more important influence than that of the judge, but it ceases to represent the judicial power. See, I de Tocqueville, Democrary in America, Judicial Power in the United States, p. 94.