William R. HOLLOWAY, Appellant,

v.

Charles L. WOLFF, Jr., Warden, Nebraska Penal and Correctional Complex, Appellee.

No. 72–1764.

United States Court of Appeals, Eighth Circuit.

Submitted May 17, 1973.

Decided July 5, 1973.

Steven G. Seglin, Lincoln, Neb., for appellant.

Betsy G. Berger, Asst. Atty. Gen., Lincoln, Neb., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, HEANEY, Circuit Judge, and TALBOT SMITH, Senior District Judge.*

HEANEY, Circuit Judge.

William R. Holloway was convicted and sentenced to ten years imprisonment. He appeals the denial of his writ of habeas corpus. The crucial issue is the validity of a search, pursuant to an invalid warrant, which turned up evidence used against Holloway at his trial.[1]

The underlying circumstances are succinctly set forth in State v. Holloway, 187 Neb. 1, 187 N.W.2d 85, 88 (1971):

"At approximately 9 p. m., on December 13, 1968, three negro males held up and robbed the bartender and patrons of Little Paul's tavern. The robbers used a sawed-off shotgun and handguns and departed with money and personal effects, including men's and women's billfolds.

"The robbery was one of a series of robberies which had occurred in Omaha. * * * The police believed that following a robbery, the robbers might go to * * * 5425 South 29th Avenue, which was the residence of Christabelle Jenkins.

"At approximately 4 p. m., on the afternoon of December 13, 1968, Sgt. Barrett executed a sworn affidavit for the issuance of a search warrant for a 12-gauge sawed-off shotgun, assorted pistols and handguns. The affidavit alleged that the sole and only reasons for his belief that the guns were con-

---

* District of Eastern Michigan, sitting by designation.

1. Holloway raises several other issues on appeal: (a) that the trial court erred in allowing an alleged accomplice to invoke the Fifth Amendment; (b) that the trial court erred in permitting certain cross- examination with respect to the defendant's prior criminal record; and (c) that the defendant has been the subject of an unconstitutional search of his person. In view of our decision to reverse because of the unconstitutional search of the Jenkins' residence, we need not reach these issues.

cealed or kept on the described premises was 'information received from an informant whose information has been reliable in the past.' The judge of the municipal court issued a search warrant for the described property, reciting that 'the following grounds exist for issuance of a search warrant, to-wit: Reliable information received from an informant whose information has been reliable in the past.'

"At approximately 6 or 7 p. m., the police began surveillance of the residence of Christabelle Jenkins from a distance of a half block. At approximately 9:15 p. m., the officers in the car heard a police radio report of a robbery at Little Paul's tavern. They left the residence for 15 or 20 minutes. Shortly after the return of the police officers to the front of the Jenkins residence, two negro males came out of the house. They were arrested by other officers some 300 feet east of the residence. The police, with their search warrant, went to the door of the residence. A 15-year-old son of Mrs. Jenkins came to the door. The police showed him the search warrant and he let them in. As they entered, they met [Holloway] coming down the stairs. He was arrested on the spot. In the front upstairs bedroom, lying on the bed, was a sawed-off shotgun, assorted cards and papers, men's billfolds and ladies' billfolds and purses."

Following the search, two police officers, Coleman and Dailey, located Christabelle Jenkins at a nearby tavern and returned her to her residence.

The defendant appealed his conviction to the Supreme Court of Nebraska, which affirmed State v. Holloway, supra. With regard to the question of whether the evidence introduced against the defendant had been unconstitutionally seized, the Court held that the warrant was invalid but the defendant had no standing to challenge the search, and, in any event, Christabelle Jenkins had consented to the search. The defendant then brought a petition for writ of habeas corpus in federal District Court. The District Court denied relief, holding that the defendant did not have standing to challenge the search and seizure.

## I. STANDING.

It is the defendant's position that he has standing to challenge the search of Jenkins' residence under the principle enunciated in Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960)—that "anyone legitimately on the premises where a search occurs may challenge its legality." Accord, McCreary v. Sigler, 406 F.2d 1264, 1267 (8th Cir.), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). The state argues that the Supreme Court of Nebraska and the District Court correctly held that the defendant does not have standing. It contends that the defendant must show some expectation of privacy beyond being legitimately on the premises for a brief period of time. This contention is without merit. The Supreme Court has recently reiterated its position that the "[p]resence of the defendant at the search and seizure was held in *Jones*, to be a *sufficient source of standing in itself*." (Emphasis added.) Brown, et al. v. United States, 411 U.S. 223, 93 S.Ct. 1565, 1568, 36 L.Ed.2d 208 (1973). See, Garza-Fuentes v. United States, 400 F.2d 219, 221 (5th Cir. 1968), cert. denied, 394 U.S. 963, 89 S. Ct. 1311, 22 L.Ed.2d 563 (1969); McDowell v. United States, 383 F.2d 599, 603 n. 4 (8th Cir. 1967).

The state also argues that the defendant does not have standing because he was not legitimately on the premises. We disagree. The evidence produced at the pretrial suppression hearing shows that the defendant is entitled to standing under the *Jones* and *Brown* cases. Holloway, a lifelong friend of Christabelle Jenkins and a twice-weekly visitor at her residence, was in the Jenkins' residence in the company of the Jenkins' children at the time of the search. While the evidence shows that Christabelle Jenkins, herself, was not home and had not invited or ex-

pected the defendant that evening, we do not believe that these facts are of great consequence in the present case. The Fourth Amendment protects the old friend who "drops in," as well as the guest who receives a specific invitation. There is nothing in the record to suggest that the defendant wrongfully gained entrance to the Jenkins' residence.[2] Thus, we hold that the determinations that the defendant did not have standing were clearly erroneous and that he may challenge the validity of the search of the Jenkins' residence.

■ We next turn to the question of whether the search of the Jenkins' residence was unconstitutional. The Supreme Court of Nebraska found that the warrant, pursuant to which the search was conducted, was an invalid one because the affidavit, on which it was based, was conclusionary and did not set forth sufficiently the underlying circumstances. The state does not challenge that this holding comports with Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and we believe that the holding of the Supreme Court of Nebraska is consistent with that case. Thus, the burden is on the state to demonstrate that this is an exceptional case justifying a warrantless search. The

state attempts to justify this search on two grounds: first, that Christabelle Jenkins consented to the search and, second, that the search was conducted pursuant to a lawful arrest of Holloway.

## II.   CONSENT.[3]

Christabelle Jenkins was not present at her residence at the time of the search. She had not consented to the search prior to its being carried out. After the evidence had been found, Officers Coleman and Dailey located her at a nearby tavern. Coleman, who knew Jenkins, informed her that her house had been searched pursuant to a warrant, that contraband had been found, and that she should return with the police to her home. She agreed to this and indicated that the police did not need a warrant.

At the suppression hearing, Jenkins confirmed that she had indicated to Coleman her willingness to cooperate, and described what she saw when she subsequently returned home:

"A.   Well, it was detectives in there. They were tearing the house up. Was already ramshackled. I went upstairs and the same thing was going on.

"Q. So when Mrs. Pittman [attorney for the state] asked you if you gave him permission on this night to be there, this is merely a formality, isn't it?
"A. Yes. He comes there all the time." This evidence may be considered on appeal in determining whether the defendant's constitutional rights were violated. See, United States v. Canieso, 470 F.2d 1224, 1226 (2nd Cir. 1972).

2.   While the evidence produced at the pretrial suppression hearing establishes that the defendant was legitimately on the premises, this fact is also supported by evidence produced at trial. The following colloquy occurred during the cross-examination of Christabelle Jenkins:
"BY MR. STUREK [Attorney for the defendant]:
"Q. You say you have known Mr. Holloway all his life; is that right?
"A. Yes.
"Q. And he frequently visits your home * * * ?
"A. Yes.
"Q. Would it be anything unusual to have him there at your home?
"A. No.
"Q. * * * [W]ould it be unusual for him to be there when just your children are there?
"A. Yes. He comes to the house a lot of times when I am not there and just the children.

3.   The state has not sought to justify the search of the Jenkins' residence on the theory that the search was consented to by the fifteen-year-old Jenkins' boy. There was no showing that he was aware of his Fourteenth Amendment rights; and in view of his age, see, United States v. Payne, 429 F.2d 169, 171 (9th Cir. 1970), and the fact that entry was gained by showing a warrant, see, Bumper v. North Carolina, 391 U.S. 543, 549–550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), we cannot say that consent was voluntarily and freely given.

"Q. When you say 'ramshackled' you mean pulling things out, clothes and stuff like that? Is that what you are referring to that they were doing?

"A. Yes.

"Q. Would this be police officers other than Mr. Coleman and Officer Dailey; right?

"A. Yes.

"Q. Did you know any of the other police officers who were doing this ransacking?

"A. No.

＊　　＊　　＊　　＊　　＊　　＊

"Q. Okay. Now, in addition to searching your home when you arrived on the premises were the police officers that you saw there, were they doing anything else?

"A. Well, some in the kitchen that were counting money. Some upstairs were pulling some clothes out and some stuff off the shelves.

"Q. Were they taking any pictures?

"A. It was—yes. It was a reporter upstairs.

"Q. You mean a photographer?

"A. Yes.

"Q. Now, did you ever give your permission to search of any time prior to the time that they came down to your place of employment—down to the Workmen's Club looking for you? Did you give them permission prior to that time to search your premises?

"A. No. I got there, they were already searching.

"Q. Prior to the time that they came to your house—to the Workmen's Club and asked you to go to your house, were they—had you given permission to search your premises?

"A. No."

Jenkins also testified that she had denied ownership of the incriminating evidence, and told the police to take whatever they wanted.

■ The Supreme Court of Nebraska held that the state had demonstrated the existence of a valid consent.

"＊ ＊ ＊ Here Christabelle Jenkins, the only proper person from whom a consent could be appropriately obtained, had known Sgt. Coleman all of her life. She did not even remember whether Sgt. Coleman had told her that he had a search warrant. Sgt. Coleman testified that when he told her he had a search warrant, she advised him he didn't need anything, and that she was willing to let him search her home. She told Coleman she wanted to cooperate and she invited Coleman and Dailey into the house when they arrived.

"Even if there were a question as to the timing of the consent compared with the time of initial entry into the house, there can be no question whatever that Mrs. Jenkins specifically authorized and directed the police to seize and take the articles found in a bedroom of her home. ＊ ＊ ＊"

State v. Holloway, *supra* 187 N.W.2d at 89–90.

We believe that this determination of the Supreme Court of Nebraska was clearly erroneous. The state has not met its burden of proving that the "consent was, in fact, freely and voluntarily given," Schneckloth, Superintendent, etc. v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in view of the following factors:

(1) The consent was secured after the police had claimed to be proceeding under a warrant. Bumper v. North Carolina, 391 U.S. 543, 549–550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); McCreary v. Sigler, *supra*, 406 F.2d at 1267. In *Bumper*, the Court stated:

"＊ ＊ ＊ A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. ＊ ＊ ＊

"When a law enforcement officer claims authority to search a home under a warrant, he announces in effect

that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."

Bumper v. North Carolina, *supra,* 391 U.S. at 549–550, 88 S.Ct. at 1792 (Footnote omitted).

The Nebraska Supreme Court relied heavily on the fact that Jenkins disclaimed the need for a search warrant and had indicated a willingness to cooperate with the police. This Court, however, in McCreary v. Sigler, *supra,* 406 F.2d at 1267, held that such disclaimers did not enable the state to meet its burden of proving voluntary consent when the police claimed to be searching pursuant to a warrant. In *McCreary,* the individual alleged to have consented to the search stated, when informed of the warrant: "You don't need it. Go ahead and search. I pay the rent here." McCreary v. Sigler, *supra* at 1267. We held that this language did not establish consent.

(2) The consent was secured after Jenkins' residence had been entered, a search carried out, incriminating evidence seized, and Jenkins told of these facts. See, Smith v. Rhay, 419 F.2d 160 (9th Cir. 1969); Gibson v. United States, 80 U.S.App.D.C. 81, 149 F.2d 381, 383, cert. denied, O'Kelley v. United States, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945); Farris v. United States, 24 F.2d 639 (9th Cir.), cert. denied, 277 U.S. 607, 48 S.Ct. 602, 72 L.Ed. 1012 (1928). The Supreme Court of Nebraska, recognizing the problem of the timing of the consent to search, suggested that Jenkins' subsequent statement at her apartment—that the police could take the incriminating evidence—constituted consent. This suggestion is without merit. The same coercive factors were still operative at the time of this alleged consent. In addition, Jenkins was face to face with the incriminating evidence and able to see that the police had firm control over her home.

(3) No showing was made that Jenkins was aware of her Fourth Amendment rights. See, Schneckloth, Superintendent, etc. v. Bustamonte, *supra,* 412 U.S. at 248–249, 93 S.Ct. 2041.

Under all the circumstances of this case, we cannot say that the alleged consent by Jenkins was anything more than "acquiescence to a claim of lawful authority." Bumper v. North Carolina, *supra,* 391 U.S. at 549, 88 S.Ct. at 1792. Thus, the search of the Jenkins' residence cannot be justified on the basis of consent.

### III. SEARCH INCIDENT TO A LAWFUL ARREST.

The search of the Jenkins' residence occurred prior to Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The state argues that the search was justified under United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), as incidental to lawful arrest of the defendant Holloway. We find no merit to this contention.

As we noted above, the police had been investigating several tavern robberies in Omaha. The police believed that a robbery would occur on December 13, and that the perpetrators might go to the Jenkins' residence. In addition, at the time of Holloway's arrest, the police had learned that the robbery of an Omaha bar had taken place, and that the robbers were two black males. The police had no further description of the robbers. Upon arrival at the Jenkins' residence, they noticed two black males leaving, and immediately arrested them. Upon entering the apartment, they arrested the defendant who was also a black male.

At most, the only "facts" which the police had, connecting Holloway to the robbery of Little Paul's Tavern at the time of his arrest, were that he was at the Jenkins' residence and that he was a black male. These "facts" are not enough to supply that "objective evidentiary justification" which our Constitution requires for an arrest in order to "guard against police conduct which is overbearing and harrassing or which

trenches upon personal security." Terry v. Ohio, 392 U.S. 1, 15, 88 S.Ct. 1868, 1876, 20 L.Ed.2d 889 (1968).

■ Under the circumstances, even if the police had probable cause to believe that the culprits were meeting at the Jenkins' residence, this fact alone would prove insufficient justification for arresting anyone who happened to be on the premises without some evidence linking the individual to the crime. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); United States v. Collins, 142 U.S.App.D.C. 100, 439 F. 2d 610, 614–615 (1971). Nor do we think that the additional fact—that Holloway was a black male—supplies probable cause for arrest, particularly in view of the fact that the police were looking for two black males and they had already arrested two leaving the Jenkins' residence. We emphasize that the police did not have a reliable description of the robbers of Little Paul's Tavern. They did not know their size, build, type of clothing, hair length or color, or anything else aside from the fact that they were black males. Moreover, no testimony was introduced to suggest that Holloway's actions at the time of his arrest were suspicious. To sanction the theory that because Holloway is a black male there was probable cause to arrest him, would lead to intolerable results. It would place in jeopardy the security of any and every black male. It would legalize just the kind of police practice condemned because it leads to friction between the police and minority group members. See, President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police, 183 (1967).[4] We hold then that the arrest of Holloway was not based on probable cause and that, therefore, his unlawful arrest could not justify the search of the Jenkins' residence.

## IV. HARMLESS ERROR.

■ Finally, the state argues that even if it was error to admit the fruits of the search of the Jenkins residence into evidence, this error was harmless. We disagree. Aside from material turned up by the search, the evidence against the defendant consisted primarily of the testimony of two patrons of Little Paul's Tavern who identified him as one of the robbers.[5] Holloway's defense was to present an alibi accounting for his whereabouts at the time of the robbery. Holloway took the stand to testify, and his alibi was corroborated by two additional witnesses. The jury's verdict then depended in large measure in resolving the question of the credibility of the witnesses. We cannot say beyond a reasonable doubt that the evidence illegally seized did not influence that determination and contribute to the conviction, and, thus, we cannot say that its introduction was harmless error. Losieau v. Sigler, 421 F.2d 825 (8th Cir. 1970).

Reversed and remanded for action consistent with this opinion.

4. The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police, 183 (1967), warns:
   "Police officers should not base decisions to arrest, stop, use force, or the like, in whole or in part, on race, poverty, or civil rights activity. All decisions must be based on objective evidence which creates suspicion, proof of guilt, or threat of danger to the officer or public, as the law requires."

5. Some additional evidence was introduced into evidence that had been seized from Holloway's person, but Holloway introduced testimony to dispute the alleged incriminating effect of this evidence.