**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**ERROL D., JR., a Juvenile,**
**Defendant–Appellant.**

**No. 00–30337.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 2001.

Filed June 21, 2002.

---

Anthony R. Gallagher, Federal Defender, and Michael Donahoe, Assistant Federal Defender, Helena, MT, for the defendant-appellant.

Sherry Scheel Matteucci, United States Attorney, Klaus P. Richter, Assistant United States Attorney, Billings, MT, for the plaintiff-appellee.

Before: B. FLETCHER, BRUNETTI, and FISHER, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge.

Errol D., a juvenile and a member of the Fort Peck Tribe, appeals his delinquency adjudication and sentence for burglarizing the Bureau of Indian Affairs ("BIA") facili-

ties management building on the Fort Peck Indian Reservation. We hold that the criminal statute under which he was charged—the Indian Major Crimes Act ("MCA") (codified at 18 U.S.C. § 1153)—does not give jurisdiction to the federal government to prosecute him, nor does it accord the district court jurisdiction to adjudge him delinquent. Accordingly, we vacate Errol D.'s delinquency adjudication and dismiss the information against him.

## I. BACKGROUND

On June 29, 1999, the facilities manager for the BIA buildings on the Fort Peck Indian reservation discovered that his office had been broken into and that a brown 1994 pickup truck, a cell phone, and a radio had been taken. A Fort Peck tribal investigator subsequently interrogated Errol, who was then sixteen years old, about the crime. Errol confessed that he was involved with two other boys in committing the burglary.

On May 16, 2000, Errol was charged with committing an act of juvenile delinquency—specifically, that he "did knowingly and unlawfully enter an occupied structure, that is the BIA Facilities Management Building, in Poplar, Montana, with the intent to commit an offense therein, to-wit: theft, which would have been a crime in violation of 18 U.S.C. §§ 1153 and 2; and 45–6–204, M.C.A., if committed by an adult."[1] The government also filed a certification pursuant to 18 U.S.C. § 5032, stating that the state of Montana did not

have jurisdiction over the crime and that the crime involved a substantial federal interest. On June 26, 2000, defense counsel filed a number of pretrial motions, raising a variety of issues including a challenge to the district court's jurisdiction.[2] The district court denied these motions without a hearing.

At the conclusion of a bench trial held on September 29, 2000, the district court orally adjudged Errol a juvenile delinquent for having committed the break-in. The district court then sentenced Errol to two years' probation and six months' incarceration as a condition of that probation. He now appeals.

We have jurisdiction to decide this appeal under 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

Issues of subject matter jurisdiction are reviewed de novo. Ma v. Reno, 114 F.3d 128, 130 (9th Cir.1997). Issues of statutory interpretation are also reviewed de novo. United States v. Jarvouhey, 117 F.3d 440, 441 (9th Cir.1997).

## III. DISCUSSION

 Pursuant to 18 U.S.C. § 5031, "juvenile delinquency" is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." Furthermore, under the MCA, 18 U.S.C. § 1153(a), in

---

1. The district court later ruled that the reference to 18 U.S.C. § 2, the federal aiding and abetting statute, should be struck and that the information should instead refer to Mont. Code Ann. § 45–2–301, the corresponding state statute on aiding and abetting.

2. Specifically, Errol D. moved to dismiss the charge against him on the ground that his case did not involve Indian on Indian crime. The district court rejected the argument, reasoning that "[t]he plain reading of the statute demonstrates that federal court jurisdiction exists under section 1153 when the defendant is an Indian who commits, within Indian country, an offense listed in section 1153." However, as discussed infra, the district court apparently overlooked the additional question whether the federal government had jurisdiction to prosecute Errol D. under the MCA since his crime was not against a "person," but instead, against the property of the BIA.

order to confer jurisdiction on the federal courts for burglaries (and other "major crimes") committed by Indians on reservation land, the alleged offense must be "commit[ted] against the person or property of another Indian or other person." We hold that because this case involved the burglary of a government facility—and because the government is not a "person" within the meaning of § 1153(a)—Errol D.'s offense did not constitute a "violation of a law of the United States" as charged under the MCA, and the district court, therefore, lacked the requisite jurisdiction to try him.[3]

In the recently-decided case *United States v. Belgarde,* 148 F.Supp.2d 1104 (D.Mont.2001), the district court confronted a similar situation involving a Montana Department of Family Services building located on an Indian reservation that had been burglarized by an Indian. The government charged the defendant under the MCA. The district court granted defendant's motion to dismiss the indictment, on jurisdictional grounds, finding that the victim of the alleged offense was not an "Indian or other person" under 18 U.S.C. § 1153. The government moved for reconsideration. *Id.* at 1105. In its motion, the government argued that § 1153 jurisdiction was proper because other federal criminal statutes define the word "person" to include entities other than individuals, specifically, "government agencies." *Id.* (citing 18 U.S.C. §§ 224(c)(3), 921(a)(1), 841(a) and 2510(6)).

For reasons we find persuasive, the district court rejected the government's argument. The district court observed, first, that none of the statutes cited by the government include within their definition of "person" any government agencies, instead listing, *inter alia,* corporations, part-

nerships, and trusts. *Id.* The court also noted that 1 U.S.C. § 1 addresses the situation where, as here, a federal statute is silent with respect to the meaning of "person," and mandates that unless the context indicates otherwise, the term "include[s] individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"—a list that does not include government agencies. *Id.* at 1106. Finally, the court discussed the statute's legislative history and concluded that "there is nothing in the legislative history of section 1153, or its purpose, that suggests the word 'person' includes government agencies." *Id.* (quoting 1 U.S.C. § 1). Accordingly, the district court denied the government's motion to reconsider, and affirmed its ruling that the MCA did not provide jurisdiction for the prosecution of the crime before it.

Like the *Belgarde* court, we can find no relevant decisional or statutory authority to support the proposition that a government agency falls within the definition of "person" as used in § 1153. Nor can we find anything in the legislative history of § 1153 to suggest that Congress intended the term "person" to be construed in a more expansive manner than its ordinary usage and meaning requires. We therefore find the reasoning of *Belgarde* highly persuasive.

As the Supreme Court recently explained, in *Vermont Agency of Natural Res. v. United States,* 529 U.S. 765, 780–81, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), there is a "longstanding interpretive presumption that 'person' does not include the sovereign.... The presumption is, of course, not a hard and fast rule of exclusion, ... but it may be disregarded only upon some affirmative showing of statuto-

---

**3.** Although Errol D. does not raise this argument before us on appeal, we are obligated to raise it *sua sponte* given its jurisdictional na-

ture. *See Reno v. Am.–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 488 n. 10, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

ry intent to the contrary." (internal quotation marks omitted); *see also United States v. United Mine Workers,* 330 U.S. 258, 275, 67 S.Ct. 677, 91 L.Ed. 884 (1947) ("In common usage, that term[persons] does not include the sovereign, and statutes employing it will ordinarily not be construed to do so."); *United States v. Cooper Corp.,* 312 U.S. 600, 606, 61 S.Ct. 742, 85 L.Ed. 1071 (1941) (in the context of the Sherman Act, rejecting the argument that "person" be read to include the federal government, noting that "[t]he more natural inference, we think, is that the meaning of the word was in both uses limited to what are usually known as natural and artificial persons, that is, individuals and corporations"). *But see Georgia v. Evans,* 316 U.S. 159, 161–62, 62 S.Ct. 972, 86 L.Ed. 1346 (1942) (interpreting "person" to include "states" and distinguishing *Cooper* on the ground that legislative intent was to permit states to bring suit under the Sherman Act.) Here, evidence of legislative intent to include government agencies within the term "other persons" is nonexistent, and, although it is possible that Congress intended "person" to be construed broadly under § 1153, such speculation cannot by itself suffice to overcome this longstanding presumption.[4]

█ In the criminal context, we are all the more reluctant to extend federal jurisdiction beyond the plain meaning of the statutory language under the rule of lenity. As the Court stated in *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987): " 'If the legislative history fail[s] to clarify the statutory language ... our rule of lenity would compel us to construe the statute in favor of petitioners, as criminal defendants in these cases.' " *Id.* at 131, 107 S.Ct. 2739 (quoting *Dixson v. United States,* 465 U.S. 482, 491, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984)). Hence, even if we were to determine that the meaning of the term "person" as used in § 1153 was ambiguous, the rule of lenity precludes our finding jurisdiction over the defendant in this case.

█ We are also mindful that " 'the standard principles of statutory construction do not have their usual force in cases involving Indian law.' " *EEOC v. Karuk Tribe Hous. Auth.,* 260 F.3d 1071, 1082 (9th Cir.2001) (quoting *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)). Because of the unique trust relationship between the United States and Indian tribes, ambiguous provisions in both treaty and non-treaty matters should be "construed liberally" in favor of the Indians. *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *see also White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–44, 100 S.Ct. 2578, 65 L.Ed.2d 665

---

4. Our holding in *FTC v. MTK Mktg., Inc.,* 149 F.3d 1036 (9th Cir.1998), is not to the contrary. That case involved whether, in the civil context and under California law, the federal government constituted a "person" for purposes of enforcing liability against telemarketing firms. Our decision relied in significant part on the fact that the language, purpose, and legislative history of the state statute clearly supported a broad remedial reading. *Id.* at 1039–40 (citing Cal. Bus. & Prof.Code § 17511(b), the "intent of the Legislature in enacting this article to ... safeguard the public against deceit ... This article shall be construed liberally in order to achieve [this]

purpose") (alterations in original). Such factors are noticeably absent here, especially in light of the fact that the primary purpose of the MCA was to adequately punish major crimes committed by Indians against Indians on reservation land. *See* William C. Canby, Jr., American Indian Law 153–54 (3d ed.1998). Unlike the statute at issue in *MTK Marketing,* we are not implored by the drafters of the MCA to "liberally" interpret its terms (as discussed *infra,* under the Indian canon of construction applicable here, we do just the opposite). For these reasons, *MTK Marketing* is not controlling.

(1980) (finding "[a]mbiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence"); *Karuk*, 260 F.3d at 1082(applying the canon to statutory interpretation); American Indian Law 103–04. Because the MCA constitutes an incursion into the tribal sovereignty of Indian tribes, justified by the "guardianship" powers of Congress, *see United States v. Kagama*, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) (upholding constitutionality of the MCA, as an exercise of Congressional power commensurate with its "duty of protection" of "a race once powerful"); *see also* David Getches, Charles Wilkinson, & Robert Williams, Federal Indian Law 474–75 (4th ed.1998), ambiguous provisions in the MCA must be interpreted in favor of the tribes. Because, as discussed further below, the General Crimes Act ("GCA"), 18 U.S.C. § 1152, grants the federal government concurrent criminal jurisdiction with the tribes, while the MCA grants exclusive jurisdiction to the federal government, as between those two statutes the latter represents a greater diminishment of tribal autonomy and ought not to be expanded by courts where such expansion is not demanded by the language of, what is here, an ambiguous statute. This canon of construction, therefore, directs that we limit the word "person" to its plain meaning.

■■■ In holding that federal jurisdiction does not extend to crimes against government entities under the MCA, we do not mean to suggest that a loophole exists in the panoply of federal criminal statutes governing Indian country. To the contrary, we believe, first, that the government could have charged Errol D. under the GCA,[5] which, by extending the Assimilative Crimes Act ("ACA") (codified at 18 U.S.C. § 13) to Indian territory, would have rendered him criminally liable for a "like offense" and a "like punishment" under state law—including, presumably, for burglaries committed against public facilities.[6] Second, and perhaps more easily,

---

**5.** The effect of the GCA is to "import into Indian Country the entire body of criminal law applicable in areas under exclusive federal jurisdiction." American Indian Law 145. The GCA states, in pertinent part, that its provisions "shall *not* extend to offenses committed by one Indian against the person or property of another Indian." 18 U.S.C. § 1152 (emphasis added). By inference, the entirety of federal enclave law otherwise applies to crimes committed by Indians against non-Indian victims on reservation land. Thus, in defining its jurisdictional scope, the GCA does not employ the term "person" in the same manner as the MCA. Put another way, § 1152 does not state that the victims of these crimes must be non-Indian "persons"; by employing the negative, § 1152 applies federal enclave law to all other situations (*i.e.,* to all crimes committed on reservations that are punishable under state law pursuant to the Assimilative Crimes Act, 18 U.S.C. § 13(a), regardless of the nature or identity of the non Indian victim—including, presumably, the government). The fears expressed by the dissent of a statutory "loophole" in law enforcement are not well taken. *Cf. United States v. Thunder Hawk*, 127 F.3d 705, 708 (8th Cir.1997) (affirming the conviction under § 1152 of an Indian defendant for driving drunk on the reservation by applying the relevant South Dakota DUI statute as incorporated through the ACA, in spite of the fact that "[t]his offense does not require a victim, whether Indian or non-Indian"). In sum, the plain language of the GCA supports our conclusion that Errol D. could have been prosecuted for burglarizing the BIA facility under § 1152, but not under § 1153. Further, he could have been prosecuted under 18 U.S.C. § 641, see discussion *infra*.

**6.** The dissent mischaracterizes our reasoning, and attempts to rely on a case easily distinguished from the situation presented here. The dissent charges the majority unjustly with "pushing the prosecution of burglary of a government agency" from the MCA, where it is presumed by the dissent to reside, into the uncertain hands of the GCA, and of "rear-

the federal government could have prosecuted the defendant under 18 U.S.C. § 641, which prohibits the theft of government property. This "federal law[ ] of general, non-territorial applicability," applies to all persons, both Indian and non-Indian, both within and outside of Indian country. *United States v. Young*, 936 F.2d 1050, 1055 (9th Cir.1991) (holding that 18 U.S.C. § 111, assaulting a federal officer; 18 U.S.C. § 922(g), possession of a firearm by a convicted felon; and 18 U.S.C. § 924(c), use of a firearm during a crime of violence, are all federal laws of general applicability under which the federal government may prosecute Indians for commission of these crimes in Indian country). *See also United States v. Begay*, 42 F.3d 486, 497–500 (9th Cir.1994) (holding that federal laws of general applicability may be used to prosecute Indians for crimes committed in Indian country, specifically, *inter alia*, 18 U.S.C. § 371, conspiracy); *United States v. Johnson*, 637 F.2d 1224, 1231 n. 9 (9th Cir.1980) (noting "exception" to exclusive tribal jurisdiction for federal laws of general applicability); *see also*

American Indian Law 142. Thus it is clear, under our own precedent, that the federal government could have prosecuted the defendant under 18 U.S.C. § 641, the federal statute prohibiting theft of government property.

In this case, however, we conclude the government simply charged Errol D. under the wrong statute.

## IV. *CONCLUSION*

At virtually every level of analysis—the plain meaning of the statutory language; the longstanding interpretive canon presuming that "person" does not include the government; the lack of contrary evidence from the legislative history or other indicators of congressional intent; the rule of lenity; and the canon of Indian law construction—we are compelled to conclude that the district court lacked jurisdiction under the MCA to convict Errol D. of the offense for which he was charged. We accordingly vacate Errol D.'s delinquency adjudication and remand to the district court with instructions to dismiss the information.

rang[ing]" the relevant criminal statutes. [Dissent at 1170].

Relying on *Henry v. United States*, 432 F.2d 114 (9th Cir.1970) (holding that the government has jurisdiction to prosecute an Indian for the rape of a non-Indian in Indian country under the MCA), for the agreeable, though irrelevant, proposition that "the 'other person' language" in § 1153 "cannot be disregarded," the dissent contends that the "only jurisdictional requirements" for the government to charge one of the enumerated crimes under the MCA are (1) that it be "committed by an Indian," and (2) that it be committed "in Indian country." [Dissent at 1169–70]. By reading "against the person or property of another Indian or other person" out of the statute, this third jurisdictional requirement defining the *victim* of the crime is made to disappear by the dissent. *Henry*, however, will not do the work that the dissent wishes it to do. *Henry* simply stands for the proposition that the phrase "or other person" does in

fact apply to non-Indian *human* persons. The citation to Cohen's *Handbook of Federal Indian Law*, [Dissent at 8983], provides no support, since it does nothing to resolve the question of how to understand the phrase "or other person," and instead notes merely that *to the extent there is* "duplication" between the MCA and the GCA, the MCA should govern. The dissent offers no citation for the proposition that Congress wished to include crimes against government agencies within the phrase "or other person," thereby creating such duplication.

Though troubled with the idea that federal jurisdiction over property crimes such as the one at issue here might be found pursuant to the GCA, which preserves tribal jurisdiction, but not the MCA, the dissent offers nothing to suggest that this cannot be so. Regardless, such discomfort with concurrent jurisdiction is no basis for the dissent's statutory construction, and does not give us the power to grant jurisdiction where it does not exist.

**VACATED AND REMANDED WITH INSTRUCTIONS TO DISMISS.**

BRUNETTI, Circuit Judge, Dissenting.

I respectfully disagree with the majority's reading of the word "person" under 18 U.S.C. § 1153, the Major Crimes Act. Contrary to the majority, I believe that, for the fourteen crimes enumerated under the Major Crimes Act, Congress intended that they be charged under the MCA rather than the General Crimes Act regardless of the identity of the victim. Therefore, by excluding a government agency from the list of possible victims of burglary, the majority creates a loophole in the statutes governing federal criminal jurisdiction over Indians in Indian country.

Congress enacted the MCA in response to the Supreme Court's holding in *Ex Parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), which held that a murder of an Indian by an Indian could not be prosecuted by the federal government under the General Crimes Act and that this crime was only punishable via the limited remedies of the tribe. The outcome in *Crow Dog* was compelled by the limited scope of jurisdiction over crimes in Indian country at that time, under the General Crimes Act ("GCA"). The GCA provided for jurisdiction over general federal enclave crimes in Indian country.[1] However, it contained two important exceptions to that grant of jurisdiction: 1) these crimes, when committed against an Indian by another Indian, could not be prosecuted by the federal government, and 2) if the tribe had already prosecuted and punished someone for a potential GCA crime, the federal government could not subsequently prosecute that individual. *See* 18 U.S.C. § 1152. As *Crow Dog* illustrated, these exceptions led to some grave crimes falling through the cracks of the statutes, prompting public outcry. Congress responded with the Major Crimes Act, by giving the United States jurisdiction over crimes committed by an Indian against an Indian, when they were of a serious nature. *See Keeble v. United States*, 412 U.S. 205, 210, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) (quoting statement of sponsor of the Act: "If ... an Indian commits a crime against an Indian on an Indian reservation there is now no law to punish the offense except, as I have said, the law of the tribe, which is just no law at all."). To do so, Congress chose seven crimes (subsequently amended to fourteen) that were sufficiently severe so as to warrant further intrusion into Indian sovereignty and their criminal jurisdiction, and gave the United States jurisdiction over these crimes. 18 U.S.C. § 1153; *see also United States v. Maloney*, 607 F.2d 222, 233(9th Cir.1979) (listing the offenses added by amendment to the Act).

The most logical manner in which Congress could have achieved this goal would have been to merely state that, for those "major" crimes, the exception contained within the General Crimes Act does not apply and therefore, Indians who commit those crimes against other Indians may be prosecuted by the federal government.

---

1. The General Crimes Act, in its entirety, states that:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152.

However, Congress chose a different path with the Major Crimes Act, which states that it gives jurisdiction over "[a]ny Indian who commits against the person or property of another Indian *or other person* any of the following offenses" and then goes on to enumerate those offenses.[2] 18 U.S.C. § 1153 (emphasis added). The wording "Indian or other person" indicates more than just the erasure of that exception in the General Crimes Act, by withdrawing the entire universe of those fourteen crimes from the ambit of the General Crimes Act.

In *Henry v. United States*, 432 F.2d 114 (9th Cir.1970), we addressed the question of what to do with the potential overlap created by the wording of the Major Crimes Act, specifically whether or not an enumerated crime (rape) in the MCA should be prosecuted under the MCA, when committed against a non-Indian. Previously, a rape of a non-Indian by an Indian would have been punishable under the General Crimes Act, but now with the enumeration of these crimes in the MCA, there seemed to be two possible statutes under which to charge the crime. The government chose to prosecute under the General Crimes Act, and we found this to be the incorrect choice. *See Henry*, 432 F.2d at 117. We held instead that the crime of rape (an enumerated crime in the MCA) committed by an Indian against a non-Indian victim on an Indian reservation

should be prosecuted under section 1153, the Major Crimes Act, rather than section 1152, the General Crimes Act. *Henry*, 432 F.2d at 118("[T]he indictment made erroneous reference to § 1152.")

Our reasoning in *Henry* is particularly relevant to the interpretation of the word "person" here. We explained that, for the enumerated crimes in the MCA, "the 'other person' language cannot be disregarded as not being a Congressional remedy for the lacunae created by the *Crow Dog* decision. Just as Congress found it desirable to find a remedy for the ousting of federal jurisdiction over crimes committed by one Indian against another, it applied the same remedy for the ousting of federal jurisdiction over crimes committed by an Indian against 'any other person.'" *Id.* at 117. As Felix Cohen explained in his *Handbook of Federal Indian Law*, "The addition [of the added language 'or other person'] created duplication between the Act and the Indian Country Crimes Act in cases where an Indian is accused of one of the offenses listed in the Major Crimes Act against a non-Indian victim. Since the Major Crimes Act is more specific and was enacted later, and since the Indian Country Crimes Act [otherwise known as the General Crimes Act] provides, 'Except as otherwise expressly provided by law,' *the Major Crimes Act should govern the offenses listed in it rather than the [General]*

2. The Major Crimes Act, in its entirety, states: (a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

18 U.S.C. § 1153.

*Crimes Act.*" Felix S. Cohen, *Handbook Of Federal Indian Law* 301 (1982) (emphasis added). In light of the analysis in *Henry* and the further explanation in Cohen's treatise, the most logical interpretation of the language in the MCA is that it includes all victims of those fourteen enumerated crimes. Therefore, the only jurisdictional requirements for charging one of these crimes under the MCA should be 1) that it was committed by an Indian and 2) that it was committed in Indian country.

However, the majority demands a more explicit indication that the MCA intended to include the sovereign in the meaning of the word "person." Although it is true that Congress did not explicitly state that the government should be included in the definition of "person" in the MCA, I do not think this is necessary, because a coherent and consistent reading of the General Crimes Act and the MCA together requires a reading of "person" to include a government agency here. In *International Primate Protection League v. Administrators of Tulane Educational Fund,* 500 U.S. 72, 83, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991), the Supreme Court stated that the "conventional reading of 'person' may be disregarded if 'the purpose, the subject matter, the context, [or] the legislative history ... indicate an intent, by use of the term to bring state or nation within the scope of the law.'" Here, the purpose and the subject matter point to inclusion of the government, and an example of the effect of the majority's holding will illustrate why the purpose and subject matter of the MCA compels such a result.

The MCA "reflect[s] a view that tribal remedies were either nonexistent or incompatible with the principles that Congress thought should be controlling." *Keeble v. United States,* 412 U.S. 205, 210, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). As stated above, Congress rectified this perceived deficiency by identifying fourteen

crimes which it deemed sufficiently important that it should provide punishment above and beyond that which Indian tribes may provide. The difference in approach by Congress to the crimes covered by the General Crimes Act and those covered by the MCA is evidenced by the inclusion, in the General Crimes Act, of the statutory bar against federal prosecution if a defendant had already been tried by an Indian tribe. No such bar exists for Indians charged with a crime under the MCA, because Congress felt these crimes were sufficiently serious to warrant federal authorities always retaining the option to prosecute, regardless of whether or not the tribe had done so already.

The majority opinion conflicts with that purpose, by pushing the prosecution of burglary of a government agency out of the purview of the Major Crimes Act and possibly into the General Crimes Act or 18 U.S.C. § 641, which prohibits the theft of government property.

This rearrangement of the prosecution of Indian burglaries in Indian country will result in a truly anomalous situation: an Indian charged with burglarizing his neighbor will be charged under the MCA, and therefore can be prosecuted by both the tribe and the federal government, but an Indian who burglarizes the BIA will be charged under the General Crimes Act, and therefore can only be prosecuted by the federal government if the tribe has not yet punished him. If the tribe has punished the offender, the federal government will be unable to prosecute him. Therefore, the ironic result is that the one scenario in which the federal government is barred from prosecuting an alleged burglary, even though it was a crime Congress thought sufficiently important to include in the MCA, will be when the offender burglarizes the government's own property and the tribe has chosen to prosecute him.

This result is reached despite the clear purpose of the MCA, to rectify incompatible or nonexistent tribal remedies for burglary and thirteen other offenses.

The majority argues that the government could also have prosecuted the defendant under § 641. However, if an Indian burglarizes a government building and rather than be charged under the MCA is instead charged under 18 U.S.C. § 641 as committing a theft of government property, the § 641 theft charge will not reflect the seriousness of the offense. A burglary charge does not have a monetary limitation whereas a § 641 theft charge for property taken with a value of less than $1,000 is considered a misdemeanor and a felony if the value is over $1,000. Furthermore, § 641 limits the penalties the government can seek to no more than 10 years for property valued at more than $1,000 and not more than a year for property valued at less than $1,000. Montana's code states that a person convicted of the offense of burglary shall be imprisoned for any term not to exceed 20 years. Charging an individual under § 641 rather than the MCA undermines the MCA's purpose of including burglary as one of the crimes considered serious enough to warrant intrusion into tribal sovereignty.

I cannot believe this is what Congress intended by the enactment of the MCA. Because the majority opinion thwarts the purpose of those statutes governing federal criminal jurisdiction in Indian country, I respectfully dissent.